Mario **VALDES**, etc., Plaintiff,

v.

James V. **CROSBY**, Jr., etc., et al., Defendants.

No. 301CV799J32HTS.

United States District Court, M.D. Florida, Jacksonville Division.

March 31, 2005.

Ellis Stuart Rubin, Stuart M. Address, Guy Bennett Rubin, Stuart, FL, Stuart Edward Goldenberg, North Palm Beach, FL, for Plaintiff.

Kevin Anthony Blazs, Ronald S. Wasilenko, Robert H. Ellis, Robert E. Blanchfield, John F. Dickinson, Sarah B. Mabery, Jacksonville, FL, Kimberly L. King, Leslei G. Street, Kelly Overstreet Johnson, Laureen E. Galeoto, Tallahassee, FL, D. Andrew Vloedman, Gainesville, FL, for Defendants.

Susan A. Maher, Tallahassee, FL, for Movant.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

CORRIGAN, District Judge.

### I. Introduction

This case is before the Court on motions for summary judgment filed by defendants Timothy Giebeig (Doc. 278), James V. Crosby, Jr. (Doc. 280), Denise McEachern (Doc. 287), Jimmie Burger (Doc. 288) and

Betty Koon, as personal representative for the estate of A.D. Thornton (hereinafter, "A.D. Thornton") (Doc. 396). These parties have filed supporting memoranda of law (Docs.279, 281, 289, 291, 397) and other evidentiary materials (Docs.282, 283, 284, 285, 286, 299). Plaintiff filed briefs in opposition (Docs.334, 336, 401) with attachments and other supporting materials (Doc. 341, 388, 392). The Court held oral argument on the motions on October 20, 2004.[1]

On July 17, 1999, inmate Joy Frances ("Frank") Valdes died after having been beaten at Florida State Prison ("FSP"). The State of Florida charged nine prison employees with crimes related to Valdes' death ranging from second degree murder to official misconduct. After four prison guards were acquitted at trial, charges against the remaining defendants were dropped. The father of Frank Valdes, plaintiff Mario Valdes, has now brought a civil suit in his own name and on behalf of his son's estate against the corrections officers who allegedly participated in or failed to stop the beatings, medical personnel who allegedly failed to provide Frank Valdes with medical treatment or to protect him from further abuse, and certain supervisory personnel. In his second amended complaint, plaintiff alleges that the actions and inactions of these defendants violated Frank Valdes' constitutional rights in violation of 42 U.S.C. § 1983 and resulted in his wrongful death in violation of Fla. Stat. § 768.20.

Defendants James V. Crosby, Jr. (who, though on vacation July 17, 1999, was the FSP warden at the time of Frank Valdes' death), Timothy Giebeig (who was the prison inspector), A.D. Thornton (who was the acting FSP warden on July 17, 1999, the day Valdes died),[2] Denise McEachern and Jimmie Burger (who were both nurses at FSP) now move for summary judgment claiming that plaintiff has failed to marshal sufficient evidentiary support for his claims and that, even if he has, qualified immunity protects these defendants from this suit.[3] The Court concludes there are no triable issues which would allow plaintiff's case against Giebeig, A.D. Thornton, McEachern and Burger to go forward, but that material issues of fact preclude granting Crosby's motion for summary judgment. The Court emphasizes that it is not finding Crosby liable, only that plaintiff has produced sufficient evidence to permit a jury to decide the case against Crosby at trial.

## II. Standard of Review

When ruling on motions for summary judgment, the Court "must view all evidence and all factual inferences therefrom in the light most favorable to the non-moving party." *Miller v. King*, 384 F.3d 1248, 1258–59 (11th Cir.2004) (citations omitted). "Issues of credibility and the weight to be afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." *Id.* at 1259 (citations and quotations omitted). Summary judgment should only be granted "when the pleadings, depositions, answers to interrogatories, and admissions on file, to-

---

1. A.D. Thornton's motion was not filed until after the October 20, 2004 argument but A.D. Thornton is represented by the same counsel as Crosby and Giebeig and all three motions raise similar arguments. No party requested argument on A.D. Thornton's motion and the Court does not find argument necessary to decide it.

2. A.D. Thornton is not related to Timothy Thornton, a corrections officer also named in this suit.

3. The remaining defendant guards (including the guards who allegedly beat Valdes) did not move for summary judgment and therefore are awaiting trial.

gether with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citations and quotations omitted). In other words, "if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party" then "[t]here is no genuine issue for trial" and summary judgment is due to be granted. *Id.* (citations and quotations omitted).

## III. Facts Taken in the Light Most Favorable to Plaintiff [4]

### A. Background

The Florida State Prison compound includes a maximum security facility which houses the most difficult and dangerous inmates within the Florida prison system. At FSP, Frank Valdes was a death row inmate housed on X-wing where he was transferred after killing a guard at another Florida correctional institution. X-wing is used to house capital offenders and the inmates at FSP who present the most serious disciplinary problems.

Prison officials at FSP and other facilities sometimes must use physical force against inmates to compel their compliance with directions and each such use of force is to be documented by prison officials. Copies of the use of force forms are forwarded to the warden. When an inmate is to be removed from his cell and refuses to submit to being restrained by handcuffs and leg irons, officials may perform a "cell extraction," wherein four or five officers use physical force to restrain and remove the inmate from his cell. Following a use of force, including cell extractions, the inmate and officials involved are seen by medical personnel who document and treat the injuries, if any, sustained by both officials and the inmate during the use of force.

Prison guards at FSP are sometimes accused by inmates of having committed an abuse of force. When such an accusation is reported on a grievance form, the inspector at the prison initially receives these charges and electronically forwards the information to the Inspector General's central office. In addition to allegations about staff abuse, hundreds of other less serious grievances (involving matters such as exercise privileges and meals) are re-

---

4. These facts are drawn from the depositions, affidavits, other testimony of record and documents filed in this case and, as adopted by plaintiff (*see, e.g.,* Doc. 341), from the file of *Mathews v. Crosby,* 3:99–cv–1117–J–32MMH. Although the Court declined to consolidate the *Valdes* and *Mathews* cases for purposes of discovery, there have been no objections to the use of discovery elicited in *Mathews* (the moving parties' counsel were present throughout discovery in both cases). Additionally, some depositions were cross-noticed for both cases and some witnesses who were deposed in *Valdes* were essentially permitted to stand on their earlier deposition testimony from *Mathews. See, e.g.,* Giebeig depo in *Valdes* (Doc. 341, Ex. 13) at Tr. 4–5 (inquiring whether Giebeig wished to change any of his earlier deposition testimony offered in *Mathews* case).

Specific attributions to the sources are only noted where deemed particularly relevant or

when directly quoting a source (and citations to material originally filed in *Mathews* are to the *Valdes* docket location where such material has been incorporated, usually Doc. 341). Testimony revealed that some of the policies or procedures described herein (such as, for example, the alphabetical codes used for wing designations) have since changed.

Some of the defendants raised hearsay objections to the Court's consideration of certain evidence offered by plaintiff. Where such evidence is included in this recitation of facts without further explanation, those objections have been overruled on the grounds that I find the evidence is sufficiently trustworthy to be admitted under Fed.R.Evid. Rule 807 for purposes of deciding these motions. However, the Court is not foreclosing the possibility that these rulings could be reconsidered at trial, depending on the development of the evidence.

ceived every week by the prison inspector and electronically forwarded on a daily basis to the Inspector General's central office. The central office reviews these inmate grievances and responds to the prison inspector regarding what further action, if any, is to be undertaken by the inspector. Copies of the inspector's report to the central office and of the central office's response are sent to the warden. The central office also receives inquiries about prison conditions from persons outside the prison, such as an inmate's family or government officials whom an inmate or his family may have contacted. Copies of the documentation of such inquiries and directions about what action will be taken are forwarded to the warden.

Although the warden is not permitted to interfere with an investigation,[5] he is in charge of the institution [6] and has the authority to transfer an inmate to another prison or to another location within the prison and to reassign a guard from one area of the prison to another. The warden also has the authority to take measures to attempt to reduce instances of prisoner mistreatment such as increasing training of prison officials, videotaping cell extractions, and rotating officers. Crosby stated that the potential for prisoner abuse by guards at any prison is always present due to the degree of authority the guards must exercise over other human beings. Crosby testified that he would move a guard to a different area if he thought there was a pattern of complaints about that guard's behavior. Crosby further testified that he did everything he could within the limits of his authority to minimize the risk of inmate abuse and to try to create an atmosphere at FSP where abuse would not occur. Crosby Oct. 29, 2003 depo in *Mathews* (Doc. 341, Ex. 12) at Tr. 243–44.[7]

5. Crosby testified that a directive to that effect was issued in March 1999 and remained in effect through at least the time of Valdes' death. Whether that policy remains in effect at this time is unknown.

6. In Florida, wardens are charged with the duty to supervise the government, discipline, and policy of the state correctional institutions, and to enforce all orders, rules and regulations. Fla. Stat. § 944.14. The parties failed to fully develop the record regarding the extent of the warden's authority in implementing these duties and there is some ambiguity in the evidence as to whether a warden has the authority to terminate a corrections officer. *See, e.g.,* Crosby Oct. 15, 2003 depo in *Mathews* (Doc. 341, Ex. 12) at Tr. 61–62 (stating that certain disciplinary actions are processed through the warden and the legal department); McAndrew depo in *Mathews* depo (Doc. 341, Ex. 17) at Tr. 29 (saying he would "fire an officer in a heart beat [and] send him to prison" if the officer were caught abusing inmates); McAndrew depo in *Mathews* (Doc. 341.Ex. 17) at Tr. 130–31 (stating that Bureau of Legal Services must be consulted for an opinion before a warden can terminate an officer).

7. Warden Patricia McCusker, who served as an assistant warden under Crosby at FSP, testified to similar effect, stating that Crosby had a proactive management style and that he kept lists of guards who had used force in the past. *See* Doc. 297 at Tr. 26–27. A.D. Thornton, who served as an assistant warden under both former warden McAndrew and Crosby at FSP, testified that while McAndrew often had concerns about specific guards including Timothy Thornton, who McAndrew moved to a position where he would be less likely to get in trouble, A.D. Thornton did not recall having conversations with Crosby about potential staff abuse of inmates. A.D. Thornton depo in *Mathews* (Doc. 341, Ex. 19) at Tr. 36. A.D. Thornton also testified that as "the man in charge of the institution," the warden would be the person to whom staff abuse allegations were brought by the inspector and that if the warden had concerns about such allegations, he would assign someone such as A.D. Thornton or "the colonel" "to look into it." *Id.* at 75–76. While A.D. Thornton further testified as to what steps he would take if asked to "look into" allegations of staff abuse, he was not questioned as to whether Crosby had in fact ever asked him to look into allegations of staff abuse.

Prior wardens at FSP had required officials to videotape cell extractions. Warden Ron McAndrew, the warden before Crosby, testified that FSP had a "notorious reputation" as an institution where guards beat the inmates (McAndrew depo in *Mathews* (Doc. 341, Ex. 17) at Tr. 33) and he felt staff were more likely to act professionally and inmates were less likely to resist the commands of the guards when they knew they were being videotaped during cell extractions. McAndrew testified that his predecessor at FSP suggested videotaping cell extractions as a method to cut down on problems during uses of force. McAndrew depo in *Mathews* (Doc. 341, Ex. 17) at Tr. 184. When Crosby became warden, he discontinued the practice of videotaping cell extractions because it was not required and he did not find it helpful.

McAndrew testified that when Crosby succeeded him as FSP warden, the two had several conversations in which McAndrew warned Crosby about certain renegade guards who McAndrew believed were abusive toward inmates and needed to be kept out of high profile areas because "[t]hey were out of hand and [McAndrew] was afraid they would kill an inmate." McAndrew depo in *Mathews* (Doc. 341, Ex. 17) at Tr. 20. One of the guards McAndrew testified he warned Crosby about in writing was Timothy Thornton, one of the defendants in this case. At the time McAndrew left FSP in February 1998, Thornton (along with Jason P. Griffis, another defendant guard in this case)

had recently been present during an X-wing cell extraction following which the inmate was "airlifted by helicopter to a hospital, where he remained for nine days and was treated for extensive injuries and spent several months recuperating." *Skrtich v. Thornton,* 280 F.3d 1295, 1300 (11th Cir.2002). The inmate's injuries from that incident included "chest trauma with multiple fractures of his ribs and hemopneumothorax, a scalp laceration, injuries to his back, shoulder and knee and abdominal trauma." *Id.* The inmate's chest "revealed the presence of an extensive amount of injuries with multiple abrasions and contusions and several markings of shoes on his back and left chest" which markings a doctor found "were probably made from a stomping motion as opposed to merely holding [the inmate] down," "consistent with physical abuse." *Id.* (citations omitted).[8] McAndrew testified that he had moved Timothy Thornton away from areas where he thought Thornton would have opportunities to cause problems. A.D. Thornton, who was an assistant warden under both McAndrew and Crosby, testified that both he and McAndrew had concern about Timothy Thornton. A.D. Thornton depo in *Mathews* (Doc. 341, Ex. 19) at Tr. 21, 34–35.[9] After Crosby became the FSP warden, Timothy Thornton was promoted to Captain, was permitted to work on X-wing, and was personally selected by Crosby to receive

---

8. Thornton and Griffis moved for a stay of the *Skrtich* civil case on the basis that the alleged facts and circumstances of that incident were so similar to the facts and circumstances of the Valdes incident that any statements they made regarding Skrtich could potentially be used against them in the State of Florida's then upcoming criminal prosecution of Thornton and Griffis for their alleged actions in the Valdes matter. *See* Doc. 25 in *Skrtich v. Thornton,* 3:99–cv–742–J–25HTS (M.D.Fla. February 29, 2000).

9. McAndrew also testified that shortly after he became warden he wanted to terminate Timothy Thornton. McAndrew reprimanded Thornton instead based in part on the advice of A.D. Thornton and another assistant, who advised McAndrew that Crosby (who at the time was the DOC director of Security and Institutional Management), had called them on Timothy Thornton's behalf to ask that Timothy Thornton be given every possible consideration. Tr. 126–30.

preferential staff housing. *Id.* at Tr. 26–27, 39–40.

A.D. Thornton also testified that Crosby was instrumental in bringing Montrez Lucas to FSP; Lucas was transferred to FSP from another correctional institution where he had worked with Crosby. *Id.* at Tr. 37–38. Lucas, who is named as a defendant in this suit for allegedly participating in the beating death of Frank Valdes, was investigated shortly after Valdes' death for teaching correctional officer trainees improper practices in June 1999 which the Department of Corrections investigation report states included the following: falsifying use of force report forms, having officers corroborate each other's "stories" to "justify" uses of force, taking "free shots" at inmates while they were handcuffed, using chemical agents on inmates without the required notice and even after inmates became compliant, reviewing medical reports before completing use of force forms to ensure conformity between the two, instructing trainees about which areas of the human body could be kicked without leaving bootprints, bringing inmates to the medical ward for treatment of minor injuries and then beating the inmates severely after they had been returned to their cells. Lucas also bragged about how he had been suspended for excessive force but had not been terminated for it. Doc. 341, Ex. 1 (May 25, 2004 deposition of Chase Riveland), at Ex. 6 (DOC Office of Inspector General Investigation # 99–22822, of Official Misconduct involving Montrez Lucas).

Reverend Andrew MacRae, who was an FSP prison chaplain from 1994 until August of 1999 testified about the marked difference in the culture at FSP after Crosby became the warden. MacRae testified that although he never witnessed an inmate being physically abused during any warden's administration, Crosby had a more "hands-off" approach than did prior wardens, thus permitting the "good old boys" network of guards to mistreat inmates. MacRae testified that after Crosby became warden, there were occasions when MacRae was prevented from seeing inmates following uses of force—which previously had been a time that he would often offer counsel to those inmates. MacRae was also familiar with the practice of "touching up" an inmate, wherein an inmate would be subjected to minor injuries during an apparently justifiable use of force and then, following corroboration of the injuries by the medical facility, the inmate would be returned to X-wing and beaten. MacRae testified that he believed these instances increased during Crosby's tenure because of Crosby's hands-off approach.

Plaintiff submitted documentation about numerous inquiries regarding alleged inmate abuse by FSP corrections officers which were forwarded to Crosby at FSP by the central office between December 1998 and July 1999. Those letters include reference to an inmate's complaint that he was "being maliciously harassed and threatened by staff" who "threatened to kill" the inmate and that his efforts to remedy the issue at the institutional level had been "to no avail"; an inmate's complaint that officers were falsifying disciplinary reports against him as a means to keep him in close management confinement; a complaint from an inmate's spouse stating that FSP staff had locked her husband in a stripped cell, were depriving him of food and were "threatening to physically abuse" him; an inmate's letter "concerning drug dealing and physical abuse by staff" which also notes that the Department of Corrections agreed to take steps to ensure that the inmate's safety would not be jeopardized because of his testimony as a witness; an inquiry on behalf of an inmate's family members who were "concerned about the inmate's safety since they allege he was beaten by [a

sergeant and] was taken to the hospital for sustained injuries" and had not had contact with him since; an inmate who wrote "alleging fear for [his] life and wishing to file a complaint against four officers" he stated were "trying to kill [him]"; a letter from another inmate who complained of being "harassed and threatened by both staff and other inmates" as a result of his status "as a witness for the State Attorney's Office"; an inquiry on behalf of an inmate who feared for his safety at FSP because he had murdered a corrections officer at another Florida correctional institute more than 15 years earlier; a letter from a death row inmate to the Florida Department of Law Enforcement ("F.D.L.E."), asking it to investigate his claims that supervisory staff at FSP failed to investigate allegations that prison officials assigned to death row permitted a violent inmate to be out of his cell without restraints so that he could threaten and intimidate other inmates; letters from several different inmates claiming that corrections officers had threatened to kill them; and a letter on behalf of an inmate discussing allegedly criminal acts committed by various guards, and questioning the need for officers to continue to use force against an inmate once he has already been restrained by handcuffs and shackles. *See* Crosby Oct. 29, 2003 depo in *Mathews* (Doc. 341, Ex. 12) at Ex. 1.

In a March 25, 1999 meeting of FSP supervisory personnel attended by both Giebeig and Crosby,[10] there was a discussion about the frequency with which certain officers were being accused of abusing inmates and what steps might be taken to

remedy the situation. *See* Giebeig depo in *Mathews* (Doc. 341, Ex. 14) at Ex. 7.

Plaintiff also references an inmate request form received by Crosby's office on June 16, 1999—a month prior to Valdes' death, which reads, in relevant part:

TO: Superintendent

FROM: Inmate Name: Seburt Connor Inportant [sic] message to Mr. Warren [sic] James Crosby. The Superintendent. Please remove Mr. Frank Valdez [sic] from X Wing! His life can be in danger! I was told by one of the guards! That he is going to die! But please dont [sic] call my name! Cause my life can be in danger too!! I have already seen an attemp [sic] on his life! I repeat dont [sic] say where you get this information! They might try to kill me too! Please note, these are the mens [sic] that I [have] seen tortureing [sic] Mr. Frank Valdez [sic][as] follows?

Connor's letter then lists the names of four officers (none of whom are defendants here) who allegedly kicked Valdes while he was face down with his arms handcuffed behind his back and a chain around his waist, while they held a wet towel over his mouth and nose and restrained his feet. *See* Doc. 338, Exhibit 1 [marked Plaintiff's Exhibit D (BATES # 000162) ].[11]

A few days before Valdes died, Giebeig and Crosby received notice of potential inmate abuse involving another X-wing inmate, Willie Mathews. Mathews had arrived at FSP on July 4, 1999 along with four other inmates from Hamilton Correctional Institution following a riot at Hamil-

---

**10.** Although Crosby's name is not listed among those present at the meeting, certain statements in the meeting minutes are attributed to him and, even if he was not present when this discussion took place, the minutes show that a copy was sent to him. The minutes also show that A.D. Thornton (an assistant warden) was absent from the meeting but

that he too received a copy of the meeting minutes.

**11.** In the copy provided to the Court, the text of this letter appears to end mid-sentence and it is not clear whether the original text carried over to another page.

ton in which several guards (including one who was pregnant) were seriously injured. At FSP, Mathews was placed in isolation on X-wing. On or before July 13, 1999, both Crosby and Giebeig were called by Mathews' mother who reported that she had received a letter from an officer working at the prison who wrote that her son, Willie Mathews, was in danger and was being abused by prison guards. In response, on July 13, Giebeig saw Mathews who complained he had been assaulted and his jaw was injured. Giebeig also spoke to the inmate in the next cell "who stated that he did not hear or see anything concerning inmate Mathews and did not want to get involved." *See* Giebeig depo in *Mathews* (Doc. 341, Ex. 14) at Ex. 2. Giebeig testified that he "had conversations with [Crosby] every day on everything going on at FSP" and that therefore Giebeig was "almost positive" that by July 13, 1999, Crosby was aware of Mathews' allegations that he was being attacked on X-wing (Giebeig depo in *Mathews* (Doc. 341, Ex. 14) at Tr. 115). Giebeig later testified that he was "sure somewhere between the 13[th] and the ... 16[th]" of July 1999, he "spoke with him [meaning Crosby] ... concerning the Mathews allegations" (Giebeig depo in *Valdes* (Doc. 283) at Tr. 28–29). Giebeig further testified that he had no actual recollection of telling Crosby that Mathews' jaw was broken. *Id.* at Tr. 36–48.

On July 15, 1999, two days before Valdes died, Mathews filed an emergency grievance stating that he was in fear for his life and was suffering from an untreated broken jaw following repeated brutal assaults by prison guards on X-wing. Mathews urged authorities to send someone to come get him and the other inmates who had come from Hamilton "before we are killed." *See* Mathews' grievance, attached as Exhibit 1 to Doc. 158 (Plaintiff's Second Amended Complaint).[12] Mathews was seen by a prison dentist who originally failed to diagnose that Mathews' jaw was broken, but by July 16, 1999, Giebeig was advised by dental staff that Mathews did in fact have a fractured jaw and Giebeig apparently reported this information to the acting warden, A.D. Thornton.[13] No use of force form was ever filed which might have explained such an injury.

Both Crosby and Giebeig testified that most prisoner complaints are unsubstantiated and Giebeig testified that upon investigation (which can involve review of medical records, interviewing inmates, officials and other witnesses), he has never found an allegation of excessive force to be substantiated. Crosby testified that he sometimes delegated the responsibility for reviewing and acting on inmate complaints to his secretary and indeed, nearly all of the above noted correspondence regarding alleged inmate abuse by guards contain notations of an "r" next to Crosby's initials, which Crosby testified indicated that his secretary (*R* honda Horler) may have handled the matter without him becoming involved or having specific knowledge of the complaints or her response. *See* Crosby Oct. 23, 2003 depo in *Mathews* (Doc. 341, Ex. 12) at Tr. 260–63.

These facts, viewed in the light most favorable to plaintiff for summary judgment purposes, provide the backdrop

**12.** Mathews did not send his grievance through the ordinary channels (it was filed as an emergency appeal) and it may be that neither Crosby nor Giebeig had seen his grievance by the time Valdes was killed.

**13.** An acting warden serves in the capacity of warden in his absence. Crosby was on vacation on July 17, 1999 when Valdes died and he believed his vacation may have begun the previous day, which would explain why Giebeig's notes reflect that he was reporting to A.D. Thornton, not Crosby.

against which the events of July 17, 1999 unfold.

## B.  Events of July 17, 1999

Raymon Hanson was an FSP corrections officer working on E-wing on July 17, 1999. In a sworn statement given on January 22, 2000 and by later deposition, Hanson testified that on the morning of July 17, 1999, his E-wing assignment was changed when Sergeant J.P. Griffis instructed Hanson that he was needed to assist in an X-wing cell extraction. Hanson changed into protective gear, including a helmet, protective vest, elbow pads, knee pads, gloves, a pair of boots and an electronic shield and proceeded to X-wing where he was told that inmate Frank Valdes had threatened Sergeant Lucas and may have a chemical grenade in his cell. Hanson knew that Valdes was on death row for killing a guard at another facility during an escape attempt and he was familiar with Valdes' reputation of being a dangerous inmate who had been known to have weapons in his cell in the past.

Hanson testified that while he and other officers were preparing for the extraction, Sergeant Griffis told Captain Timothy Thornton that "Valdes has had this coming to him." *See* Doc. 334, Exhibit 3 (Hanson statement) at Tr. 13. Based on his past experience participating in cell extractions, Hanson took this statement to mean that the officers "were going to go down there and teach [Valdes] that he can't be threatening officers and he has to comply with the rules, that being on disciplinary confinement wasn't enough, that some physical punishment was going to have to be inflicted on him." *Id.* at Tr. 13–14.

Accompanied by Sergeants Griffis, Saul and Brown, Hanson, who is 6′ 4″ tall and at the time weighed approximately 310 pounds, was to be the first officer into the cell. Officers Lewis, Beck and Stanford, Sergeant Lucas and Captain Thornton were all present but were not part of the extraction team. On X-wing, Hanson smelled the strong odor of gas which he assumed had been used on Valdes in failed attempts to peaceably extract him from his cell. When Valdes' cell door was opened, Hanson attempted to back away because of irritation to his eyes, skin and nose caused by the severe gas fumes emanating from Valdes' cell. At the time, Valdes, who was wearing only boxer shorts, was standing in the center of the cell holding a towel to his face. One of the sergeants held Hanson in place and, while Captain Thornton stood in the doorway, Hanson then proceeded to enter Valdes' cell where Valdes was now curled up on the floor in a fetal position, with his hands covering his face and head. Valdes was not resisting or acting aggressively and no weapons were visible in his cell. Hanson had intended to pin Valdes to the ground and to discharge his electronic shield on Valdes but the shield had become caught on the doorway and accidentally discharged on another officer. Hanson testified that while he then moved out of the way to put the shield on the cell bunk, the other officers began punching, striking and kicking Valdes, who remained on the ground, not showing any signs of resisting. Valdes was turned onto his stomach and Hanson then came over and stood on Valdes' legs to prevent Valdes from kicking anyone while the other officers continued punching him. Hanson stated that he then kicked Valdes in the buttocks out of frustration and then left the cell because he was having difficulty breathing due to the gas fumes.

After getting a towel to wipe his face, Hanson returned to the cell where he saw Sergeant Brown violently kicking Valdes in the midsection, while saying to Valdes, "Who you gonna kill now, [expletive]?" Hanson then left the cell to tell Officer Beck to get a pair of leg irons. When Hanson returned, Valdes was in the door-

way of the cell, and Sergeant Brown's boot was in Valdes' face. Captain Thornton then directed Valdes to stand up and when he did not, Hanson testified that Captain Thornton put a hand-held electronic restraint device to Valdes' forehead and released the trigger, shocking Valdes with an electric charge. Valdes, who was handcuffed by this point, was then dragged out of the cell and placed on the ground. When he refused to stand, Captain Thornton slapped him across the face.

Officers then put Valdes on a cart and wheeled him to the medical clinic (about 1/4 mile away from X-wing) where one of the officers helped Valdes walk into the emergency room where he then laid down on an examining table. Hanson testified that Nurse Denise McEachern saw Valdes first and that she told the officers that she wanted a male nurse to handle Valdes. McEachern told investigators that she observed Valdes slumped forward with blood on his face. She knew Valdes had a reputation for being dangerous around females and for her own safety she decided to have Jimmie Burger, an available male nurse, examine Valdes. Hanson testified that after McEachern left, Sergeant Griffis punched Valdes in the mid-section and Valdes then sat up on the examining table. McEachern stated that she may have seen Captain Thornton slap Valdes at some point as she passed the room.

Nurse Jimmie Burger came to the room to examine Valdes. Sergeant Brown and Captain Thornton remained with Valdes while the other officers were examined in another room by Nurse McEachern and Nurse Robin Rash, who was called to assist so that the officers, who reeked of the chemicals used in Valdes' cell, could leave more quickly. Nurse Burger testified that during the approximately 25 minutes he

spent examining Valdes, he observed him to be alert, oriented and responsive and suffering from only minor injuries typical of those sustained during a cell extraction, including an abrasion on his lip, a recent bloody nose, some discoloration to his right shoulder and three circular red marks down his left side which Burger believed were marks indicating use of an electronic shield. Burger testified that Valdes' vital signs were normal. Nurse Rash briefly saw Burger with Valdes while Rash was in the clinic preparing to assist Nurse McEachern with her examination of the officers. Nurse Rash's observations of Valdes' condition are consistent with the report from Burger.

During his exam of Valdes, Burger believed that one of the officers intentionally harassed Valdes by shining a surgical light into his face, although this did not interfere with Burger's ability to complete the exam and did not result in injuries to Valdes. Also, when Burger momentarily left the room, he said he heard a loud noise that sounded perhaps like a slap but he was not sure the sound came from the room where Valdes was. Citing several examples of inmates who had been seriously injured in the past, Burger stated that he knew that officers sometimes subjected an inmate to minor injuries during a use of force and later, after a medical exam confirmed the minor injuries, the officers would take an inmate back to his cell "and beat him half to death." *See* F.D.L.E. Investigative Report # 514, transcript of November 22, 1999 undercover meeting at Tr. 49. Burger stated that he had a "negative feeling" about the manner in which officers were treating Valdes. However, Burger determined that there was not a basis to call a doctor [14] or to keep Valdes in

---

14. In fact, the doctor on call that day happened to call the clinic while Burger was seeing Valdes and Burger told McEachern to tell the doctor that Valdes had no injuries needing further treatment by a doctor (such as sutures for example).

the medical department for observation and he therefore authorized his release.[15]

Once Valdes was released from medical, Hanson accompanied officers who pushed Valdes in a wheelchair back to an empty cell on X-wing. Hanson testified that shortly thereafter, the officers involved in the cell extraction gathered in a room to complete their use of force forms, using the medical reports and falsified information to justify their actions and Valdes' injuries. Hanson testified that the injuries he observed on Valdes included a small amount of blood coming out of his mouth or nose and some abrasions to his chest or shoulder area. Hanson further testified that Officer Sauls reported that Valdes had a boot print on his neck which Sauls said he had inflicted while restraining Valdes. Hanson stated that Valdes was not having difficulty breathing and Hanson did not think Valdes' injuries were very significant. Hanson depo at Tr. 123, 185. When Hanson later viewed photographs of

Valdes taken at the time of his death, he thought that Valdes' condition in those photographs was significantly different than his condition following the cell extraction. Once the use of force forms were completed, Hanson returned to his other assignments and did not see Valdes again before his shift ended that afternoon.

Nurse McEachern testified that at about 2:00 p.m. that day she was called by Captain Thornton who reported that an inmate (later identified as Valdes) on X-wing had sustained a facial laceration during an intentional fall from his bunk but that the inmate stated that he was all right. Thornton reported that McEachern told Thornton that "she would pass it on to the next shift." See Doc. 254, Ex. D (Department of Corrections FSP July 17, 1999 6:58 p.m. incident report from T.A. Thornton, Capt.). McEachern states that Thornton advised her that the inmate's injuries were not serious and he agreed that she could examine the inmate when

---

15. Plaintiff attempts to create a triable issue of fact regarding Valdes' condition while in the medical facility that morning based in part on a statement by Burger to McEachern during an undercover meeting on November 22, 1999 to the effect that, contrary to Burger's other statements, when Burger saw Valdes following the extraction, his "ribs kicked in, his lungs weren't that clear." However, this line of the actual transcript shows an "inaudible" at the beginning of Burger's sentence just prior to this phrase and, given the conversation just before and after this line about how the nurses could not have missed observing Valdes' injuries if he was in such bad condition, it is unreasonable to take this phrase as a statement of Burger's belief about Valdes' condition at the time Burger treated him. See Doc. 341, Ex. 4 (F.D.L.E.I.R.# 514) at Tr. 4. Plaintiff also points to other statements from Burger and McEachern regarding the amount of blood on Valdes' face and a statement from McEachern about Valdes moaning, as well as a seemingly contradictory statement by McEachern given to investigators in which she stated that when Valdes arrived in the medical unit following

the cell extraction, she told Burger that it appeared that officers had "beaten the s --- out of him." See McEachern depo (Doc. 298) at Tr. 97. When questioned about this statement, McEachern was not sure why she had said that but thought that it looked like Valdes had "had a good tussle with the officers." Id. at Tr. 99. Inmates are often injured during legitimate uses of force, especially during cell extractions which, by their very nature, involve officers forcibly extracting a recalcitrant prisoner from his cell. Thus, it is not unusual, as Burger and others testified, to see injuries to inmates following extractions. See, e.g., Doc. 299, Exhibit 5 (excerpt of June 16, 2004 deposition testimony of plaintiff's prison expert, Chase Riveland at Tr. 69–71); Doc. 299, Exhibit 7 (affidavit of Victor Selyutin, M.D.) at ¶¶ 9–14; Doc. 299, Exhibit 9 (affidavit of Thomas S. Edwards, M.D.) at ¶¶ 8–11, 17–21. The evidence marshaled by plaintiff is not necessarily contradictory to a finding that Valdes' injuries at this point appeared minimal and it is certainly not sufficiently colorable to create a triable issue of fact as to this point.

she made her scheduled rounds around 3:00 p.m. Officer Beck reported that he began checking on Valdes every 15 minutes after he observed him intentionally fall from his bunk. *See* Doc. 254, Ex. D (Department of Corrections FSP July 17, 1999 6:58 p.m. incident report from Dewey Beck). Beck reported that when he observed Valdes at 3:00 p.m., Valdes again intentionally fell to the ground but again reported that he was fine. Beck reported that upon observation at 3:15 p.m., Valdes was "lying on the floor looking like he wasn't breathing." *Id.* Beck then called medics. *Id.*[16]

As she prepared to make her 3:00 p.m. rounds, McEachern received the call that emergency medical assistance was needed on X-wing. Nurse Helen Roberts, who was present at the time, testified that McEachern told Roberts that it was inmate Valdes "just acting up again" and they would see him during their rounds. *See* Doc. 334 at Exhibit A (partial transcript of Roberts' testimony from state criminal proceeding).[17] Another call came moments thereafter insisting that medical attention be sent to X-wing immediately. Roberts testified that even then McEachern reported that she had seen Valdes earlier in the day, that he was okay and that he would be fine. *Id.* The nurses then made their way to X-wing where they learned that Valdes was in cardiac arrest. McEachern assisted two officers who were performing CPR on him. The officers reported that when they began CPR on Valdes he did not have a pulse and was not breathing. Officers reported to McEachern that Valdes had apparently injured himself by repeatedly throwing himself off his bunk onto the concrete floor. They put Valdes onto a stretcher and brought him back to the medical unit where McEachern began an IV while officers continued CPR. Rescue units arrived shortly thereafter and took Valdes to a hospital where he was pronounced dead at 4:18 p.m. on July 17, 1999. The medical examiner's autopsy of the following day revealed

> [m]ultiple blunt traumatic injuries including contusions, abrasions and lacerations of face and scalp, fracture of mandible; patterned and unpatterned abrasions and contusions on anterior and posterior trunk, multiple serial rib fractures of right and left halves of ribcage, fracture of sternum, right and left hemothoraces, and subcutaneous emphysema extending from lower face to scrotum; lacerations and hemorrhage of gut mesenteries and liver capsule; hemorrhage within and around right adrenal gland; abrasions of right and left legs from knee to ankle level and linear abrasions on right and left wrists.

*See* Doc. 299, Exhibit 8. The medical examiner found these injuries to be fresh, having occurred within five to ten minutes of

**16.** The truthfulness of Beck's reports about his observations of Valdes are disputed by plaintiff; but there is no dispute that the nurses' knowledge about Valdes' condition at the time was based, at least in part, on the reports the nurses received from the guards. Thus, the content of those reports, even if their truthfulness is in dispute, is relevant in determining whether the nurses have any liability for their actions and is therefore included in this recitation.

**17.** McEachern has raised a hearsay objection to the testimony of Helen Roberts which was given in the state criminal case against the guards. Generally, inadmissible hearsay cannot be considered when ruling on summary judgment. *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 783 (11th Cir.2004). However, where the testimony would be admissible non-hearsay evidence at trial (which the Court assumes it would be here because Roberts' recitation of McEachern's statements would be those of a party-opponent), the Court may consider it. *See Macuba v. Deboer*, 193 F.3d 1316, 1322–25 (11th Cir.1999).

Valdes' death. *Id.* The probable cause of death was listed as "beating." *Id.*[18]

The State of Florida brought criminal charges of murder, conspiracy, battery and official misconduct against several of the guards who were allegedly involved in the death of Frank Valdes. After four of those officers were tried and acquitted, charges were dropped against the others. The Department of Justice has confirmed that it is investigating this case; thus federal criminal charges arising out of Valdes' death are still possible.[19] Because of this possibility, the defendant guards (with the exception of Raymon Hanson, whose testimony is described above) have refused to testify in this case, claiming Fifth Amendment privilege. The guards have not sought summary judgment; thus, regardless of the outcome of the motions filed by Crosby, Giebeig, A.D. Thornton, McEachern, and Burger, the case will proceed to trial against the guards.[20]

## IV. Relevant Legal Principles

### A. Eighth Amendment Jurisprudence

■ Plaintiff has sued defendants for compensatory and punitive damages claiming that they violated Frank Valdes' Eighth Amendment right to be free from cruel and unusual punishment. "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citations and quotations omitted). "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Id.* "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 833, 114 S.Ct. 1970 (citations and quotations omitted). However, "[i]f prison conditions are merely restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Miller,* 384 F.3d at 1260. "Prison conditions rise to the level of an Eighth Amendment violation only when they involve the wanton and unnecessary infliction of pain." *Id.* Here, if it can be shown that prison guards unnecessarily beat Valdes, causing his

**18.** Some of the defendant guards intend to offer expert testimony that Valdes' death may have been caused or contributed to by his voluntary ingestion of acetaminophen. That testimony is the subject of a *Daubert* motion not addressed in this opinion.

**19.** The federal investigation is now over three years old and federal authorities are unable to say when it will conclude. Thus, the Court is proceeding with this civil case.

**20.** This recitation of facts stated in the light most favorable to plaintiff does not rely on testimony from either Robert Krebs, an inmate who was at FSP and knew Valdes, or Chase Riveland, plaintiff's prison expert (with a minor exception, *see* footnote 15, *supra* ). The hearsay issues with Krebs' testimony likely render much of it inadmissible but because

decision on these motions is not dependent on his testimony, the Court is not making any final decision on those objections at this time. As for Riveland, the Court expects that his testimony about the general field of corrections, prison supervision and management and the like, will assist the jury and will likely be admissible at trial for that purpose. However, the Court has concerns about Riveland's opinions concerning the factual events of this case because, for the most part, the evidence on which he bases those opinions does not appear to be complex or in need of interpretation by an expert. There has been no need to rely on his opinions about those matters to decide these motions and the Court will therefore reserve final rulings on the *Daubert* motions related to Riveland's expert testimony until closer to trial.

death, his Eighth Amendment rights would be violated by those who participated in the beatings.[21]

### 1. Supervisory Liability

■ In his claims against the three supervisory officials, Crosby, Giebeig, and A.D. Thornton, additional legal principles apply because "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Miller*, 384 F.3d at 1261 (citations and quotations omitted). Rather, "[s]upervisory liability under § 1983 occurs only when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id.* (citations and quotations omitted).

■ A causal connection may be demonstrated when "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so," or when "a supervisor's custom or policy results in deliberate indifference to constitutional rights," or when the "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Id.* (citations and quotations omitted). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990). "The standard by which a [prison] supervisor is

held liable in his individual capacity for the actions of a subordinate is extremely rigorous." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir.2003).

### 2. Deliberate Indifference to an Inmate's Medical Needs

■ Plaintiff alleges that Nurses Denise McEachern and Jimmie Burger violated Frank Valdes' Eighth Amendment right to be free from cruel and unusual punishment by failing to attend to his serious medical needs. A prison official's "deliberate indifference to the serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citations and quotations omitted). While "[t]he standard of care applicable to nurses is universal, and does not diminish when the setting is a jail rather than a hospital." *McDowell v. Brown*, 392 F.3d 1283, 1296 (11th Cir. 2004), "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir.2003) (citations and quotations omitted). "The inadvertent or negligent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain." *Id.* (citations and quotations omitted).

■ "To show that a prison official acted with deliberate indifference to serious medical needs," a plaintiff must first "set forth evidence of an objectively serious medical need," which, in this Circuit, "is considered one that has been diagnosed by a physician as mandating treatment or one

---

**21.** Thus, this case is different from many Eighth Amendment cases where it is not alleged that prison officials actually participated in the beating of an inmate, but that prison officials allowed inmates to attack each other

and were deliberately indifferent to the situation. *See e.g., Purcell ex rel. Estate of Morgan v. Toombs County, GA*, 400 F.3d 1313, 1319 (11th Cir.2005).

that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," such that "if left unattended, [would] pose[ ] a substantial risk of serious harm"; and second, the plaintiff must show that the official responded to this serious medical need with "deliberate indifference." *Id.* A plaintiff may establish a constitutional deprivation by demonstrating that his serious medical needs were met with "treatment so cursory as to amount to no treatment at all" or "delay of treatment for obviously serious conditions where it is apparent that delay would detrimentally exacerbate the medical problem, the delay does seriously exacerbate the medical problem, and the delay is medically unjustified." *Taylor v. Adams,* 221 F.3d 1254, 1259–60 (11th Cir.2000) (quotations and citations omitted). *See also, Brown v. Johnson,* 387 F.3d 1344, 1351 (11th Cir.2004) (reaffirming above statement of the current law).

### C. Qualified Immunity

The five defendants before the Court on these motions each claim that even if plaintiff has created a triable issue concerning whether any of them committed a constitutional violation, qualified immunity protects them from liability in this suit. "Qualified immunity protects government officials acting within their discretionary functions from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights that a reasonable person would have known." *Skrtich v. Thornton,* 280 F.3d 1295, 1302 (11th Cir.2002) (citations omitted). The relevant inquiry is "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.* (citations and quotations omitted).

Thus, assuming the officials have acted within their discretionary functions (and there is no suggestion here that they did not), at the summary judgment stage, the qualified immunity analysis involves a two-step process—first, has plaintiff put forth sufficient evidence to show that a jury could reasonably find that one or more of these defendants violated Valdes' constitutional rights and second, was it clearly established under the law at the time that their conduct would violate those rights.[22]

### D. State Law Claim

Defendants further argue that because plaintiff has failed to demonstrate that his federal § 1983 claims are sustainable, his state law claim for wrongful death is due to be dismissed because the basis for the Court's supplemental jurisdiction over this claim (which indisputably arises out of the same nucleus of operative facts as plaintiff's federal claims) will be extinguished. The defendant nurses further claim that they are immune from suit for plaintiff's state law claims under the Sovereign Immunity Act, Fla. Stat. § 768.28. Defendants Crosby and Giebeig additionally argue that plaintiff has failed to offer sufficient evidence to support a wrongful death action.

### V. The Court's Decision

### A. Plaintiff's § 1983 Claims

#### 1. Defendant James V. Crosby, Jr.

As stated above, supervisory liability can only be established in one of two ways—either by showing personal participation by a supervisor in a constitutional violation or by demonstrating "a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Miller,* 384 F.3d at

---

**22.** A recent Supreme Court decision has suggested that the sequential order of these steps may be reconsidered in a future case. *See*

*Brosseau v. Haugen,* 125 S.Ct. 596, 598 n. 3, 160 L.Ed.2d 583, and concurring opinion at 600–01 (2004).

1261. Plaintiff contends that the facts support his claims against Crosby in both these ways. However, there is no evidence that Crosby personally participated in the beating of Valdes or that any guards were following specific direction from Crosby in using excessive force against Valdes. Thus, the acts and omissions alleged by plaintiff are not of a type which could support a claim of "personal participation" by Crosby. *Cf., H.C. by Hewett v. Jarrard,* 786 F.2d 1080, 1087 (11th Cir.1986) (finding superintendent's actions of throwing detainee against wall and then denying him medical treatment implicated him personally). *See also, Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990) (examining only whether causal connection could be established based on widespread history of objectionable conditions without regard to personal participation analysis because jail director had no direct involvement in creating those conditions); *Goodson v. City of Atlanta,* 763 F.2d 1381, 1388 (11th Cir.1985) (describing how jail director's failure to properly train or supervise his employees, coupled with his knowledge of resulting constitutionally deficient conditions of incarceration, sufficiently supported liability of director in his role as supervisor, even though director had no personal participation or involvement in constitutional deprivation); *Adams v. Franklin,* 111 F.Supp.2d 1255, 1265 (M.D.Ala.2000) (noting that sheriff and jailer were not even present at jail on night plaintiff was allegedly denied necessary medical treatment and plaintiff properly did not allege any personal participation by those supervisors).

■ The Court therefore turns to plaintiff's claim that he can establish liability through a causal connection between Crosby's actions and the alleged constitutional deprivation committed by Crosby's subordinates. Generally in such inquiry, the Court first addresses the involvement of the supervised employee(s) who have allegedly committed the Eighth Amendment violation. *See e.g., Cottone,* 326 F.3d at 1358–59, 1361 (establishing first that plaintiff sufficiently stated claim that guards had committed constitutional violation of prisoner's rights by failing to monitor inmates and then addressing whether any causal connection existed between actions or omissions of supervisory officials and guards' actions). At this juncture, however, the supervised employees (the guards) have not moved for summary judgment and Crosby, Giebeig, and A.D. Thornton, the supervisory officials, have not attempted to refute the evidence that Valdes died because of a beating administered in violation of the Eighth Amendment. Indeed, the Court need look no further than the medical examiner's autopsy report described above to find that plaintiff has created a triable Eighth Amendment issue. *See* Doc. 229, Exhibit 8 (medical examiner's report detailing the "multiple blunt traumatic" and "fresh" injuries covering Valdes's body from his face to his ankles, including multiple broken bones and internal hemorrhaging, all of which led the medical examiner to determine that the probable cause of death was "beating"); *see also, Skrtich,* 280 F.3d at 1302 (holding that "[t]he undisputed evidence in [the] record reflected that Skrtich had been electrically shocked to render him unable to resist, and then kicked, punched and beaten," and noting that "[i]n the absence of any evidence that any force, much less the force alleged here, was necessary to maintain order or restore discipline, it is clear that Skrtich's Eighth Amendment rights were violated").

Having sufficiently established for the purposes of these motions that a constitutional violation occurred, plaintiff must further show the existence of "a causal connection between the actions of a supervising official and the alleged constitutional deprivation" which can be established

when "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so," or when "a supervisor's custom or policy results in deliberate indifference to constitutional rights," or when "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Miller*, 384 F.3d at 1261 (citations and quotations omitted).

Plaintiff has produced evidence from which a jury could find that Crosby received copies of all the complaints referenced above (and many more not specifically cited) concerning the abuse of inmates by guards at FSP, including allegations of abuse against Valdes; Crosby had been specifically warned by his predecessor about certain renegade guards whose abuse of inmates was so severe that the prior warden felt one of them might kill an inmate if not stopped; and that Crosby's own staff held a meeting in which they raised concern about the frequency with which certain guards were being accused of abusing inmates.

Plaintiff has also presented evidence that Crosby, who was in charge of FSP, had a reputation for being a "hands-off" warden; regularly delegated responsibility for his office's grievance response management to his secretary, admitting that she often exercised full authority over the handling of grievance management without any input from Crosby; elected to end videotaping of cell extractions because it was not required even though other wardens felt it led to staff acting more professionally; promoted and gave preferential treatment to Timothy Thornton, the guard who former warden McAndrew had warned Crosby might "kill an inmate"[23] and who had recently been involved in a cell extraction where the inmate's resulting injuries were so severe that he was life-flighted to a hospital for treatment; failed to keep guards with known records of alleged abuse away from assignments near at-risk inmates such as those on X-wing; and failed to properly investigate the complaints of Mathews, an incident in which an X-wing inmate in isolation sustained a broken jaw and no use of force form was on record to explain the injury, and Connor, the inmate who warned Crosby that guards were planning to kill Valdes.

This evidence, taken together, is sufficient to entitle plaintiff to attempt to prove at trial that inmate abuse at the hands of guards was not an isolated occurrence but rather occurred with sufficient regularity as to demonstrate a history of widespread abuse at FSP. Whether Crosby actually drew the inference of widespread abuse and was therefore "on notice of the need to correct or to stop" abuse by officers[24] then becomes a factual question for the jury. *Cottone*, 326 F.3d at 1362; *Smith v. Brenoettsy*, 158 F.3d 908, 913 (5th Cir.1998) (holding that where plaintiff pointed to record facts to suggest that warden had requisite knowledge that guard posed substantial risk of serious harm, question of whether warden "actually drew the inference" was question of fact for jury).

All of this evidence, again taken together, is also sufficient to allow a jury to consider whether Crosby had established customs and policies that resulted in deliberate indifference to constitutional violations and whether Crosby failed to take

---

**23.** *See* McAndrew depo in *Mathews* (Doc. 341, Ex. 17) at Tr. 81.

**24.** The law does not require a party to show that a supervisor "knew precisely who would attack whom." *Hale v. Tallapoosa*, 50 F.3d 1579, 1583 (11th Cir.1995).

reasonable measures to correct the alleged deprivations. *Cottone*, 326 F.3d at 1360. *See also, Miller*, 384 F.3d at 1263 (finding that plaintiff had created a triable issue as to whether warden was liable either personally or in his supervisory capacity based on warden's knowledge of inmate's conditions and his failure to exercise authority as warden to ensure that guards corrected the conditions); *Smith*, 158 F.3d at 912–13 (dismissing warden's appeal of denial of summary judgment in light of factual disputes as to warden's knowledge of substantial risk and reasonableness of warden's response where plaintiff, who was stabbed by a prison guard, sent letters to warden complaining of verbal abuse and threats by guard and warden responded that sheer volume of unsubstantiated complaints made investigation of every complaint unreasonable).

Thus, given the facts as described above (which the Court reiterates are presented in the light most favorable to plaintiff[25]), plaintiff has produced sufficient evidence to create a triable issue as to whether a causal connection can be established between Crosby's actions and the alleged constitutional deprivation.[26]

█ Crosby, however, claims that even if plaintiff has established a constitutional violation, Crosby is protected by qualified immunity. Although it was clearly established that Valdes' constitutional rights would be violated if he were beaten to death by guards using excessive force[27] (for purposes of these motions, the Court must assume that is what occurred here), it is not the liability of the guards that is at issue in this motion but, rather, that of the warden. Thus, the question is whether it was clearly established at the time of Valdes' death that a warden could face liability under § 1983 predicated on his failure to take reasonable steps in the face of a history of widespread abuse which created a known substantial risk of serious harm to inmates or his adoption of custom or policies which result in deliberate indifference to the constitutional rights of prison inmates. The answer is "yes"; in 1999 (when Valdes died) it was clearly established that a warden, the person charged with directing the governance, discipline, and policy of the prison and enforcing its orders, rules, and regulations (*see* Fla. St. § 944.14), would bear such liability. *See, e.g., LaMarca v. Turner*, 995 F.2d 1526, 1539 (11th Cir.1993) (holding that prison warden could face liability when his failure to take appropriate measures to improve prisoner safety created a climate which

---

**25.** Indeed, the current record reveals material factual disputes regarding much of this evidence. Compare, for example, the depositions of Crosby and McCusker with those of McAndrew, McRae, Giebeig and A.D. Thornton, in which the deponents offer conflicting testimony as to whether Crosby gave preferential treatment to guards such as Timothy Thornton who had reputations as being "enforcers" who abused inmates or whether Crosby took adequate measures to monitor and curb staff-on-inmate violence; whether Crosby ended videotaping practices or whether they were not in existence in the first place; and whether Crosby was a "hands-off" or "hands-on" warden. These evidentiary disputes cannot be resolved on summary judgment.

**26.** Plaintiff has not presented evidence from which to draw an inference that Crosby "directed [his] subordinates to act unlawfully or knew that subordinates would act unlawfully." *Miller*, 384 F.3d at 1261.

**27.** *See, e.g., Skrtich*, 280 F.3d at 1302 (stating that by 1998, Eleventh Circuit "precedent clearly established that government officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated"); *Bruce v. Wade*, 537 F.2d 850, 853 (5th Cir.1976) (a violation of § 1983 is clearly stated by the unjustified beating of an inmate at the hands of prison officials).

preordained the violence which ensued);[28] *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1443 (11th Cir.1985) (holding safety director whose responsibility included disciplining police officers and setting police department policy could be liable for failing to take corrective steps in the face of pattern of excessive force engaged in by officers).

The Court will deny Crosby's motion for summary judgment as to Count I. As required in summary judgment practice, this ruling is based on facts cast in the light most favorable to plaintiff and construing all reasonable inferences in plaintiff's favor. It is clear from the depositions that much of the evidence upon which plaintiff relies will be strongly disputed, no doubt causing a jury to wrestle with difficult credibility choices. Nonetheless, based on the evidence presented and the controlling Eleventh Circuit precedent, plaintiff must

be permitted to proceed to trial against Crosby. *Miller,* 384 F.3d at 1262 (noting that, while defendants "hotly dispute" plaintiff's assertions, plaintiff's "evidence creates genuine issue of material fact" regarding Eighth Amendment violation).[29]

### 2. Defendant Timothy Giebeig

■ The analysis of the potential liability of Giebeig, the FSP inspector, falls along the same lines as that described for Crosby. First, there is no evidence that Giebeig personally participated in the alleged beating of Valdes or directed others to participate. Second, like Crosby, Giebeig received copies of the extensive documentation related to alleged inmate abuse by guards. He also attended the meeting in which concerns were raised about this issue. A reasonable jury could infer that Giebeig was also on notice of a widespread history of abuse of inmates.[30]

---

28. At the trial in *LaMarca* (which also addressed claims for injunctive relief), the defendant warden argued that he had done all he could with the budget he had and the court heard extensive testimony about how prison funds were spent by the defendant warden as compared to his successors and predecessors. *See LaMarca,* 995 F.2d at 1537–38. Although the evidence presented on these motions is nowhere near as extensive, Crosby did present some evidence about steps he took to improve conditions. *See, e.g.,* McCusker depo, Doc. 297, at Tr. 26 (testifying about Crosby's efforts to curb abuse). However, as stated above, plaintiff's evidence (such as that Crosby abandoned measures adopted by his predecessor like videotaping cell extractions and moving renegade guards like Thornton away from problem inmates), is sufficient to create a triable issue as to whether the steps Crosby did take were reasonable.

29. The Court is aware that, at first blush, its decision on the motion filed by Crosby in this case may appear to be inconsistent with the Court's decision to grant his summary judgment motion in the *Mathews* case, where much of the same evidence was considered. *See* Case No. 3:99–cv–1117–J–32MMH, Doc. 379. However, as promised, the Court has taken a fresh look at the evidence and has

also considered the further development of the record in this case. Also, the Mathews incident itself plays a role in this case because, by July 17, 1999 when Valdes died, Crosby was (or should have been) aware of the relevant facts of the Mathews incident: that inmate Willie Mathews, who Crosby knew had just arrived at FSP following an alleged assault on a corrections officer at another facility, had suffered a broken jaw allegedly at the hands of guards on X-wing and no use of force report had even been filed regarding the incident. Given the accumulation of the other evidence already at his disposal, this additional information helps to create a triable issue as to whether Crosby was aware that certain FSP guards were acting in a manner which presented a substantial risk of serious harm to inmates, whether Crosby's customs and policies fostered this environment, and whether Crosby reasonably responded to this risk.

30. Giebeig also agreed that as the institutional inspector, he was responsible for "keeping [his] eyes and ears open and alert to staff abuse of prisoners." Giebeig depo in *Mathews* (Doc. 341, Ex. 14) at Tr. 131–32.

However, whether Giebeig failed to take steps to abate that risk is a closer question. Unlike the presentation of evidence against the warden, Crosby, plaintiff has not shown measures that Giebeig was tasked with handling but failed to take; rather plaintiff takes issue with the thoroughness of the steps Giebeig did take.

The uncontroverted evidence reveals that Giebeig's role was to gather the initial information about certain incidents including reports of abuse and forward his findings to the Inspector General's Office which determined what further action, if any, would be undertaken by Giebeig as the inspector at the prison. *See generally,* Giebeig depo in *Mathews* (Doc. 341, Ex. 14) at Tr. 21–24, 27–28; Giebeig depo in *Valdes* (Doc. 283) at Tr. 50–51. Once a matter was referred back to Giebeig for further investigation from the Inspector General (which Giebeig testified did not generally occur until a day or more after the reported incident),[31] Giebeig's role expanded to collecting additional information by interviewing inmates, staff, medical personnel, or other witnesses; reviewing reports and other documentation such as log books; taking photographs and visually inspecting scenes and other such measures to make an assessment of whether the allegations could be substantiated. *See* Giebeig depo in *Mathews* (Doc. 341, Ex. 14) at Tr. 28–48. Once Giebeig's report was complete, he forwarded it to the Inspector General (with a copy to the warden). In the event the Inspector General had only called for an internal investigation, any additional information was gathered at the direction of the warden who was given a copy of any resulting report, as was the Inspector General's office. Giebeig depo in *Valdes* (Doc. 341, Ex. 13) at Tr. 50–51.

While the documentation of Giebeig's investigations into complaints such as that of Mathews may leave open the question as to whether more could have been done (such as, for example, probing further to determine what exactly it was that the inmate next to Mathews did not want to get involved with when he was questioned about Mathews), and although Giebeig's failure to substantiate a single instance of inmate abuse is questionable, this alone is insufficient to create liability. The evidence established that Giebeig was responsible for investigating incidents and reporting his findings to others (*see* Giebeig depo in *Valdes* (Doc. 283) at Tr. 45–47 (testifying that inspector's obligation is to report activity and role of warden is to act on it)); no evidence suggested that Giebeig was responsible for or had the authority to prevent or correct problems relating to abusive guards. Thus, the Court finds plaintiff has failed to create a triable issue as to whether Giebeig violated plaintiff's constitutional rights because plaintiff has not demonstrated a causal connection between Giebeig's actions (or inactions) and the alleged constitutional deprivation.[32] Giebeig's summary judgment motion is therefore due to be granted as to Count I.[33]

---

31. An exception to this routine occurred whenever Giebeig telephoned his supervisor in the Inspector General's office to report an incident that required more immediate attention. Giebeig offered examples of an employee arrest, a fire or a serious stabbing as incidents fitting this category. Giebeig depo in *Mathews* (Doc. 341, Ex. 14) at Tr. 83. Giebeig testified that he immediately called his supervisor upon learning from Dr. Poston that Mathews' jaw was broken. *Id.* at Tr. 109–10.

32. The Court therefore need not consider whether Giebeig is entitled to qualified immunity.

33. Although a ruling in favor of Giebeig, whose responsibility included determining whether allegations of abuse were meritorious, may seem inconsistent with a ruling against Crosby, who relied on the results of Giebeig's investigations, plaintiff has mounted sufficient other evidence to compel the denial of Crosby's motion, such as evidence that

### 3. Defendant A.D. Thornton

■ Plaintiff's claim against A.D. Thornton as a supervisory official can only be established by showing personal participation in a constitutional violation or by demonstrating a causal connection between the supervisor's actions and the deprivation. Although A.D. Thornton was at FSP on July 17, 1999, plaintiff has pointed to no evidence that A.D. Thornton participated in or was aware of the circumstances surrounding Valdes' death.[34] Thus, the Court considers only whether plaintiff has demonstrated any causal connection between A.D. Thornton's actions and the constitutional deprivation allegedly committed by the guards. Though plaintiff's second amended complaint alleges that A.D. Thornton was involved in supervisory decisions, plaintiff has failed to support these allegations with any evidence to show that A.D. Thornton, or assistant wardens generally, had any policy-making role at FSP, or that A.D. Thornton was aware of any

"culture" of widespread abuse at FSP. A.D. Thornton testified that while he and the prior warden McAndrew often discussed problem guards, he did not recall ever having such conversations with Crosby. Although A.D. Thornton was the acting warden on July 17, 1999, the day Valdes died (and perhaps the day before as well), this alone is insufficient to hold him liable for Valdes' death under § 1983. Plaintiff having offered no evidence to support a finding that any action by A.D. Thornton had any causal connection to the alleged actions of the guards, A.D. Thornton's motion is due to be granted as to Count I.[35]

### 4. Defendant Jimmie Burger

■ As set forth above, to establish a prison official's deliberate indifference to a serious medical need, plaintiff must first set forth evidence of an objectively serious medical need that if left unattended would pose a substantial risk of serious harm.

Crosby was or should have been aware of the sheer volume of staff abuse allegations based on his receipt of all inmate complaints (whether deemed meritorious by Giebeig or not), that Crosby was or should have been aware of the recent Skrtich incident, that Crosby met with his staff and was advised of alleged abuse by staff, and that he was aware or should have been of the plea from Seburt Connor asking Crosby to intervene to save Valdes' life. Most significantly, it was the warden, Crosby, not Giebeig, who was specifically charged with the governance of FSP and who had the authority to take any necessary steps to reduce the risk of inmate abuse by guards.

**34.** In his response to A.D. Thornton's motion for summary judgment, plaintiff states that, according to the trial testimony of inmate Robert Krebs, A.D. Thornton told Valdes that when Crosby went on vacation, Valdes would be killed. As noted above, *see* footnote 19, *supra,* the Court has not relied on Krebs' testimony due to hearsay issues; however, Krebs' trial testimony does not identify the speaker of these specific threats, although he does mention conversations between Valdes

and Sergeant Montrez Lucas in which the two exchanged death threats.

**35.** Although plaintiff deposed A.D. Thornton as a witness in the *Mathews* action, A.D. Thornton was not deposed in this case at any time prior to his death in April 2004. (A.D. Thornton was not a party in *Mathews*. At the time his deposition was taken, A.D. Thornton had been named in this suit and his counsel was present at the deposition).

As with plaintiff's § 1983 claim against Giebeig, plaintiff's § 1983 claim against A.D. Thornton suffers from a failure of proof, especially regarding A.D. Thornton's state of knowledge and job responsibility. Thus, the Court is not saying that § 1983 claims could never be brought against prison supervisory officials such as inspectors or assistant wardens in similar circumstances, only that plaintiff has failed to provide sufficient evidentiary support for these claims against these two defendants. On the other hand, plaintiff mounted sufficient evidence to create a triable issue as to the warden Crosby's state of knowledge and his responsibility.

*Farrow,* 320 F.3d at 1243. The Court finds that Valdes did not have an objectively serious medical need when seen by Nurse Burger in the medical clinic following the morning cell extraction. Although the abuse Valdes sustained in his cell (as described by Hanson) certainly had the potential to create serious injuries requiring further attention, the unrebutted medical evidence is that Burger's exam revealed that Valdes suffered minor injuries consistent with those seen by medical personnel in prisons following cell extractions and there was no basis for Nurse Burger to order further treatment. Thus, plaintiff has failed to support his claim that Jimmie Burger violated Valdes' Eighth Amendment rights based on deliberate indifference to a serious medical need [36] and Burger's motion for summary judgment is therefore due to be granted as to Count II.[37]

### 5. Defendant Denise McEachern

Because the Court finds plaintiff has failed to demonstrate that Valdes had an objectively serious medical need when he came to the clinic following the morning cell extraction, McEachern likewise has no liability based on such a claim. However, plaintiff also claims that McEachern was deliberately indifferent to Valdes' medical needs when she was called to respond to his emergency in the afternoon. Based on the information known to McEachern at the time, plaintiff has failed to demonstrate that a jury could reasonably find that McEachern would have known Valdes

had a serious medical need. During the first call (around 2:00 p.m.) the undisputed evidence is that guards told McEachern that Valdes said he was fine and even if after receiving the later calls (around 3:00 p.m.) McEachern appeared to Nurse Roberts to have a laissez-faire attitude and did not immediately respond, McEachern still arrived on X-wing within minutes of receiving the call and guards were attending to Valdes' medical needs by administering CPR. Thus, even if there was a delay, there is no evidence that it created or exacerbated Valdes' injuries. *See McDowell,* 392 F.3d at 1299–1300, 1302 (noting that plaintiff offered no reliable evidence that earlier medical intervention would have prevented or diminished injury beyond well known theory that "the sooner" medical treatment is afforded, "the better," which "has nothing to do with causation"). Thus, plaintiff has failed to support a claim that Denise McEachern violated Valdes' Eighth Amendment rights based on deliberate indifference to a serious medical need [38] and McEachern is therefore due to be granted summary judgment as to Count II.

### B. Plaintiff's State Law Claim

Although the focus of the parties' arguments centered on the § 1983 claims, these defendants also moved for summary judgment on plaintiff's state law wrongful death claim, Count III. Having found that plaintiff has failed to create a triable issue as to the liability of defendants Giebeig, A.D. Thornton, Burger or McEachern un-

---

**36.** Thus, the Court need not reach the issue of whether Burger is entitled to qualified immunity.

**37.** To the extent plaintiff has attempted to state a claim based on Burger's failure to prevent officers from further abusing Valdes, plaintiff has not presented evidence that Burger had more than a suspicion that further abuse might occur (thus obviating the

possibility that Burger acted with deliberate indifference in the face of such a risk). Due to this failure of proof, the Court need not reach the further question of whether clearly established law would require a prison nurse to act in such circumstances.

**38.** The Court therefore does not consider whether McEachern is entitled to qualified immunity.

der 42 U.S.C. § 1983, the Court could simply dismiss plaintiff's wrongful death action against these four defendants, permitting plaintiff to bring his state law claim in state court. *See* 28 U.S.C. § 1367(c)(3) and (d). However, in determining whether to retain jurisdiction over state law claims once federal claims have been dismissed, the Court is to "consider concerns of comity, judicial economy, convenience, fairness and the like." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1267 (11th Cir.2001) (quotations and citations omitted).

■ These defendants have each pled[39] that they are entitled to sovereign immunity pursuant to Florida's Sovereign Immunity Act, which grants immunity to state employees for tort actions unless the employee "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property." Fl. Stat. § 768.28(9)(a). Plaintiff concedes that the standard to overcome this immunity is at least as high as the standard needed to prove his § 1983 claims against these defendants. *See, e.g., Williams v. City of Minneola*, 619 So.2d 983, 986 (Fla. 5th DCA 1993) (necessary showing of wanton and willful disregard sufficient to overcome § 768.28(9)(a) immunity is equivalent to showing of recklessness); *Farmer*, 511 U.S. at 836, 114 S.Ct. 1970 (showing of

deliberate indifference is equivalent to showing of recklessness).

Thus, for the same reasons the Court finds plaintiff has failed to create a triable issue of fact as to whether Giebeig, A.D. Thornton, McEachern, and Burger are liable under § 1983, the Court also finds plaintiff has failed to marshal sufficient evidence to overcome the protection afforded these four defendants under Florida's Sovereign Immunity Act. The Court therefore declines to exercise its discretion to simply dismiss plaintiff's state law claims against these defendants pursuant to 28 U.S.C. § 1367(c)(3) and instead finds that considerations of judicial economy, convenience and fairness dictate that McEachern's, A.D. Thornton's, Burger's and Giebeig's summary judgment motions be granted as to Count III, plaintiff's wrongful death claim.[40]

As to defendant Crosby, other than arguing that the Court's supplemental jurisdiction over the state law claim should be extinguished if the § 1983 claim is dismissed (an event that is not occurring at this time), Crosby raises one additional argument contained in a single sentence which states, "there is no record evidence to suggest that Crosby had any direct involvement in the death of Valdes." Doc. 281 at 19. Plaintiff did not respond to this point. However, "direct involvement" may not be required to state a wrongful death claim under Florida law.[41] Although plain-

---

**39.** *See* Answers and Affirmative Defenses, Docs. 165 & 169.

**40.** These findings are based on the parties having intensely litigated this case in this forum for a period of more than three years.

**41.** A wrongful death claim against a supervisory official or entity is a legally available cause of action. *See, e.g., Stoker v. Smith*, 1999 WL 224579, *5, 12 Fla. L. Weekly Fed. D 306 (M.D.Fla. Mar.11, 1999) (denying motion to dismiss wrongful death claim against sheriff for shooting death of unarmed suspect by police where plaintiff alleged duty, breach, causation and damages); *Gutierrez v. City of*

*Hialeah*, 729 F.Supp. 1329, 1332 (S.D.Fla. 1990) (holding that doctrine of *respondeat superior* could support wrongful death claim against police chief for shooting death but that claim should be dismissed nonetheless due to potential for jury confusion with § 1983 claim); *Saunders v. Rhode Island*, 731 F.2d 81, 82 (1st Cir.1984) (describing special interrogatories posed to jury which determined that although warden was aware that guards permitted inmates out of cells, warden's failure to stop practice was not failure of exercise of reasonable care to protect inmate from attack and thus, warden's actions were not proximate cause of inmate's death).

tiff's second amended complaint sufficiently pleads the elements necessary to support a claim for wrongful death, neither party has directed the Court to any specific record evidence which supports or refutes this claim and the Court therefore declines to grant summary judgment based on this undeveloped argument. However, this denial will be without prejudice to Crosby re-filing a motion for summary judgment as to Count III only at a later date.

## VI. Conclusion

Accordingly, it is hereby

**ORDERED:**

1. The Summary Judgment Motions filed by Defendants Timothy Giebeig (Doc. 278), Betty Koon, as personal representative for the estate of A.D. Thornton (Doc. 396), Denise McEachern (Doc. 287) and Jimmie Burger (Doc. 288) are **GRANTED**.

2. There being no just reason for delay, the **Clerk shall enter a separate final judgment** against plaintiff and in favor of defendants Timothy Giebeig, Betty Koon, as personal representative for the estate of A.D. Thornton, Denise McEachern and Jimmie Burger pursuant to Fed.R.Civ.P. 54(b).

3. Defendant James V. Crosby, Jr.'s Motion for Summary Judgment (Doc. 280) is **DENIED**.

4. Although the Court has granted summary judgment in favor of defendants Giebeig, McEachern, and Burger, the Court does not find that plaintiff's claims against these defendants were so lacking in evidentiary support that Rule 11 sanctions are warranted.[42] Therefore, Defendant Jimmie Burger's Motion for Sanctions (Doc. 304), Defendant Denise McEachern's Motion for Sanctions (Doc. 305), and Defendant Giebeig's Motion for Sanctions (Doc. 350) are DENIED. For obvious reasons, Defendant Crosby's Motion for Sanctions (Doc. 349) is DENIED.

5. The Court's decision on these motions did not require it to decide any of the *Daubert* motions (Docs.274, 276, 292) and they will therefore remain pending at this time. However, it appears the relief sought by Defendant Crosby's and Giebeig's Motion to Strike Supplemental Opinions of Plaintiff's Expert Chase Riveland (Doc. 272) has now been granted, at least in part, so the Court will **DENY** that motion at this time without prejudice to renewal when the Court takes up the *Daubert* motions.

6. Defendants Denise McEachern and Jimmie Burger's Motion to Strike Portions of Plaintiff's Memorandum in Response to Defendant McEachern and Burger's Motions for Summary Judgment (Doc. 358) is **DENIED**.

7. Plaintiff's Partially Unopposed Motion to Take Deposition of Expert (Dr. Slepin) Beyond Discovery Deadline (Doc. 381) is **MOOT**, the Court now having granted summary judgment in favor of the parties who intended to offer Dr. Slepin as an expert witness in the trial of this case.

8. Defendant Crosby's Motion to Supplement Defendant Crosby's Memorandum of Law in Support of Motion for Summary Judgment (Doc. 394) is **GRANTED**. The Court has considered the additional points raised in the motion to supplement.

---

42. Fed.R.Civ.P. Rule 11; *see also, Byrne v. Nezhat*, 261 F.3d 1075, 1105–06 (11th Cir. 2001) (describing standard for award of Rule 11 sanctions).

*See also, Matallana v. School Board of Miami–Dade County*, 838 So.2d 1191, 1192 (Fla. 3rd DCA 2003) (affirming summary judgment for defendant for wrongful death of student in fight with classmate because School Board's duty to student ended when students left school grounds).

9. Plaintiff's Cross–Motion to Strike Memorandum in Support of Motion (Doc. 395) is **DENIED**.

10. In addition to the *Daubert* motions noted above, the pending motions still remaining are the Motions to Dismiss and for Fees related to defendants Rash and Hudnall (Docs.241, 324). The Court will address these motions by separate Orders.

11. Because the record utilized by the parties is somewhat scattered and many matters upon which the parties relied came from the *Mathews* file, for convenience of appellate review, plaintiff is directed to assemble one complete appendix of all record materials cited in this opinion (this includes complete copies of all depositions which must also include a complete set of deposition exhibits). The appendix should include an index which cross-references the citations used by the Court in this opinion. Plaintiff shall deliver the appendix to chambers of the undersigned no later than April 29, 2005, with service copies to defendants. Following review, the Court will file the appendix and it will become part of the record of this case.

12. By separate Order, the Court will re-set this case for a settlement conference before the Honorable Harvey E. Schlesinger, United States District Judge.[43]

13. The undersigned will await results of the settlement conference before determining what further action should be taken, including setting this case for trial.

DONE AND ORDERED.

---

**43.** To afford the parties a fair opportunity to engage in settlement discussions, the Court would favorably entertain a motion for extension of time to file a notice of appeal under Federal Rules of Appellate Procedure Rule 5.