[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 31, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-13065

_____

D. C. Docket No. 01-00799-CV-J-32-HTS

MARIO VALDES,
individually, and as personal representative of
the estate of Joy Francis 'Frank' Valdes,

Plaintiff-Appellee,

versus

JAMES CROSBY,
in his individual capacity,

Defendant-Appellant,

TIM GIEBEIG, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(May 31, 2006)**

Before TJOFLAT, BARKETT and GOODWIN[*], Circuit Judges.

BARKETT, Circuit Judge:

This is an interlocutory appeal by James V. Crosby, former warden of Florida State Prison ("FSP"),[1] from the denial of his motion for summary judgment based on qualified immunity. Mario Valdes sued Crosby and several other FSP employees, alleging, inter alia, that they violated the Eighth and Fourteenth Amendment rights of his son, Frank Valdes ("Valdes"), by subjecting him to an excessive and unjustified use of force, which led to his death while he was incarcerated at FSP.[2]

While Crosby was the warden of FSP, Valdes was a death row inmate housed on X-wing, where inmates with the most serious disciplinary problems were assigned. Valdes had been transferred to FSP after killing a guard at another Florida correctional institution. On July 17, 1999, Valdes died after having suffered extensive beating wounds all over his body. The second amended complaint alleged that prison guards beat Valdes to death, and that Crosby knew

---

[*] Honorable Alfred T. Goodwin, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1] FSP is a Florida state maximum security facility.

[2] Mario Valdes filed suit in his own name and that of his son's estate. This appeal involves only the question of whether the district court erred in denying Crosby's motion for summary judgment based on qualified immunity.

2

about the general propensity for violence against inmates at FSP, especially by certain corrections officers, some of whom were involved in the beating of Valdes, but that Crosby was deliberately indifferent to the risk of abuse. Crosby moved for summary judgment on the grounds that he was entitled to qualified immunity. The district court denied the motion, and Crosby now appeals.

## STANDARD OF REVIEW AND INTERLOCUTORY APPEAL

While the general rule is that a denial of summary judgment is not ordinarily subject to immediate appellate review because it is not an appealable final judgment under 28 U.S.C. § 1291, "[a] district court's order <u>denying</u> a <u>defense</u> of <u>qualified immunity</u> is an appealable final decision within the meaning of 28 U.S.C. § 1291 to the extent that it turns on a question of law." <u>Cook v. Gwinnet County Sch. Dist.</u>, 414 F. 3d 1313, 1315 (11th Cir. 2005) (quoting <u>McMillian v. Johnson</u>, 88 F.3d 1554, 1562 (11th Cir. 1996)) (emphasis added). We may review an interlocutory appeal "so long as the core qualified immunity issue is raised on appeal, a final, collateral order is being appealed, and the appellate court has jurisdiction to hear the case, including challenges to the district court's determination that genuine issues of fact exist as to what conduct the defendant engaged in." <u>McMillian</u>, 88 F.3d at 1563.

3

For the purposes of an interlocutory appeal from the denial of qualified immunity, we accept the district court's factual determinations and recite those facts as set forth in the district court's order, supplementing them where necessary with additional evidentiary findings of our own from the record. See Rayburn ex rel. Rayburn v. Hogue, 241 F.3d 1341, 1342 (11th Cir. 2001) (citing Cottrell v. Caldwell, 85 F.3d 1480, 1486 (11th Cir. 1996); Johnson v. Jones, 515 U.S. 304, 319, 115 S. Ct. 2151 (1995) ("[T]he court of appeals can simply take, as given, the facts that the district court assumed when it denied summary judgment.")). Where we supplement the record, we construe the facts and draw all inferences in the light most favorable to the nonmoving party. See Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005).

## DISCUSSION

As we have often stated, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (internal citations and quotation marks omitted). In order to receive the protection of qualified immunity, the government official must first

4

prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (citing Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)).[3]

Once eligibility for qualified immunity is established, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. Lee, 284 F.3d at 1194. This step consists of a two-part inquiry, set forth in Saucier v. Katz, 533 U.S. 194 (2001). First, we ask, "do the facts alleged show the government official's conduct violated a constitutional right?" Id. at 201. If a constitutional violation is established, based on the facts in the light most favorable to the plaintiff, we then must determine whether such conduct would have violated federal law that was clearly established at the time of the incident. Garrett v. Athens-Clarke County, 378 F.3d 1274, 1278-79 (11th Cir. 2004) (citing Saucier, 533 U.S. at 201-02).

I. Violation of a Constitutional Right

We first address the question of whether Crosby violated Valdes' Eighth Amendment right to be free from cruel and unusual punishment. "The Constitution

---

[3] There is no question in this case that Crosby was acting within the scope of in his discretionary authority as warden of FSP.

5

does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citations and quotation marks omitted). "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." Id. "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." Id. at 833 (citations and quotation marks omitted).

We have held that supervisors can be held liable for subordinates' use of excessive force against inmates in violation of the Eighth Amendment on the basis of supervisory liability under 42 U.S.C. § 1983. Miller v. King, 384 F. 3d 1248, 1261 (11th Cir. 2004). Supervisory liability under § 1983 occurs "when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." Id. We agree with the district court that there is insufficient evidence that Crosby personally participated in the beating of Valdes, or that any guards were following specific direction from Crosby in using excessive force against Valdes. Thus, the question presented is whether there was

6

a causal connection between Crosby's actions or inaction and the beating and death of Valdes.

A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so. Cottone v. Jenne, 326 F. 3d 1352, 1360 (11th Cir. 2003).[4]

Therefore, we begin our analysis by addressing whether the district court erred in concluding that sufficient facts were presented to support liability against Crosby through a causal connection between his actions and the alleged constitutional deprivation committed by Crosby's subordinates.

A.

The facts, construed in the light most favorable to Valdes, the nonmoving party, are as follows. Corrections Officer Raymon Hanson testified that on July 17, 1999, he was told to assist in the cell extraction of Frank Valdes, whom he

---

[4] The district court ruled that there was a causal connection based on: 1) a "history of widespread abuse"; and 2) a supervisor's custom or policy. Valdes v. Crosby, 390 F. Supp. 2d 1084, 1102-03 (M.D. Fla. 2005).

7

knew was on death row for killing a guard at another facility during an escape attempt. Hanson testified that while he was preparing for the extraction, Sergeant Griffis told Captain Timothy Thornton that "Valdes has had this coming to him." Based on his past experience participating in cell extractions, Hanson took this statement to mean that the officers "were going to go down there and teach [Valdes] that he can't be threatening officers and he has to comply with the rules, that being on disciplinary confinement wasn't enough, that some physical punishment was going to have to be inflicted on him."

When Valdes' cell door was opened, Hanson, one of the first to enter, noticed Valdes was standing in the center of the cell holding a towel to his face and only wearing boxer shorts. Valdes then curled up on the floor in a fetal position, with his hands covering his face and head. Valdes was not resisting or acting aggressively, and no weapons were visible in his cell. Hanson testified that when he moved to put his shield on the cell bunk, the other officers began punching, striking and kicking Valdes, who remained on the ground, not resisting. Valdes was turned onto his stomach and Hanson then stood on Valdes' legs to prevent Valdes from kicking anyone while the other officers continued punching him. Hanson left the cell because he was having difficulty breathing due to gas fumes that were released in the cell.

8

After getting a towel to wipe his face, Hanson returned to the cell where he saw Sergeant Brown violently kicking Valdes in the midsection, while saying to Valdes, "[w]ho you gonna kill now, [expletive]?" Valdes was moved to the doorway where Sergeant Brown put his boot to Valdes' face. Captain Thornton then directed Valdes to stand up and when he did not, Thornton put a hand-held electronic restraint device to Valdes' forehead and released the trigger, shocking Valdes with an electric charge. Valdes, who was handcuffed by this point, was then dragged out of the cell and placed on the ground. When he refused to stand, Thornton slapped him across the face. Officers then put Valdes on a cart and wheeled him to the medical clinic.

One of the defendant nurses, Denise McEachern, told investigators that she observed Valdes slumped forward with blood on his face. Hanson testified that after McEachern left, Griffis punched Valdes in the mid-section. McEachern stated that she may have also seen Thornton slap Valdes at some point as she passed the room. Another defendant nurse, Jimmie Burger, testified that Valdes seemed alert, oriented and responsive and suffering from only minor injuries typical of those sustained during a cell extraction, including an abrasion on his lip, a recent bloody nose, some discoloration to his right shoulder and three circular red marks down his left side, which Burger believed were marks indicating use of an

9

electronic shield. Burger testified that Valdes' vital signs were normal. Burger also testified that when he momentarily left the room, he heard a loud noise that sounded like a slap, but he was not sure the sound came from the room where Valdes was located.

Citing several examples of inmates who had been seriously injured in the past, Burger stated that he knew that officers sometimes subjected an inmate to minor injuries during a use of force and later, after a medical exam confirmed the minor injuries, the officers would take the inmate back to his cell "and beat him half to death." Burger stated that he had a "negative feeling" about the manner in which officers were treating Valdes. However, Burger determined that there was not a basis to call a doctor or to keep Valdes in the medical department.

Once Valdes was released from the medical department, Hanson accompanied officers who pushed Valdes in a wheelchair back to an empty cell on X-wing. Hanson testified that shortly thereafter the officers involved in the cell extraction sought to justify their actions by completing their use of force forms based on medical reports and false information. Hanson testified that the injuries he observed on Valdes included a small amount of blood coming out of his mouth or nose and some abrasions to his chest or shoulder area. Hanson further testified that officer Sauls reported that Valdes had a boot print on his neck which Sauls

10

said he had inflicted while restraining Valdes. Hanson stated that Valdes was not having difficulty breathing and Hanson did not think Valdes' injuries were very significant.

Nurse McEachern testified that she was called later that day by Thornton, who told her Valdes had sustained a facial laceration during a fall from his bunk. Thornton advised McEachern that Valdes' injuries were not serious. Shortly thereafter, Officer Beck reported that Valdes again fell off his bunk, and was "lying on the floor looking like he wasn't breathing," and medical attention was necessary. When the nurses arrived, Valdes was in cardiac arrest. Rescue units arrived shortly thereafter and took Valdes to a hospital, where he was pronounced dead at 4:18 p.m.[5]

While, officers reported to McEachern that Valdes had injured himself by repeatedly throwing himself off his bunk onto the concrete floor, Mario Valdes presented evidence that his son's death was due to a massive physical beating. The medical examiner's autopsy of the following day revealed:

> [m]ultiple blunt traumatic injuries including contusions, abrasions and lacerations of face and scalp, fracture of mandible; patterned and unpatterned abrasions and contusions on anterior and posterior trunk,

---

[5] Mario Valdes alleges that a few months after Valdes was killed McEachern agreed to be wiretapped. In a conversation with Burger, McEachern and Burger discussed past incidents of officers abusing inmates, including those incidents involving a Henry Donaldson, David Skrtich, Mark DeFreist, and Milton Belk.

multiple serial rib fractures of right and left halves of ribcage, fracture of sternum, right and left hemothoraces, and subcutaneous emphysema extending from lower face to scrotum; lacerations and hemorrhage of gut mesenteries and liver capsule; hemorrhage within and around right adrenal gland; abrasions of right and left legs from knee to ankle level and linear abrasions on right and left wrists.

The medical examiner found these injuries to be fresh, having occurred within five to ten minutes of Valdes' death. The probable cause of death was listed as "beating." Moreover, when corrections guard Hanson viewed photographs of Valdes taken at the time of his death, he thought that Valdes' condition in the photographs was significantly different from his condition following the cell extraction.

Based on these facts, we have no difficulty ruling that Mario Valdes has sufficiently stated a claim that guards at FSP committed a constitutional violation and thus, we turn to the issue of whether Crosby can be held liable as a supervisor.

B.

Construed in the light most favorable to the nonmoving party, the facts pertaining to whether Crosby was put on notice by a history of widespread abuse at FSP, or whether he had established customs or policies resulting in deliberate indifference to a prisoner's constitutional rights, reflect the following. Crosby was

12

preceded as warden of FSP by Ron McAndrew.[6] Warden McAndrew testified that when Crosby succeeded him as FSP warden, the two had several phone conversations, as Crosby declined McAndrew's invitation to meet in person. In those conversations, McAndrew specifically warned Crosby about certain guards, who McAndrew believed were abusive toward inmates and needed to be kept out of high profile areas, such as X-wing, because "[t]hey were out of hand and [McAndrew] was afraid they would kill an inmate." McAndrew also taped a list of these guards to the center drawer of the warden's desk.

One of the guards that McAndrew testified he specifically warned Crosby about was Timothy Thornton, one of the defendant officers in this case accused of beating Valdes to death. When McAndrew left FSP in February 1998, Timothy Thornton (along with Griffis, another defendant guard in this case) had recently been one of the guards involved when a prisoner was extracted from his cell in X-wing and beaten so severely that the prisoner had to be "airlifted by helicopter to a hospital, where he remained for nine days and was treated for extensive injuries and spent several months recuperating." Skrtich v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002). The inmate's injuries from that incident included "(1) left chest

---

[6] McAndrew testified that he had over twenty years of experience as an officer, sergeant, lieutenant, investigatory, deputy warden, and warden of another Florida state facility before becoming warden of FSP.

13

trauma with multiple fractures to the left ribs and left hemopneumothorax, (2) back injury with fractured multiple transverse processes, (3) right scalp laceration, (4) left shoulder and right knee injury, (5) abdominal trauma, and (6) post trauma anemia" Id. The inmate's chest "revealed the presence of an extensive amount of injuries with multiple abrasions and contusions and several markings of shoes on his back and left chest," which markings a doctor found "were probably made from a stomping motion as opposed to merely holding [the inmate] down," "consistent with physical abuse." Id. (Internal quotation marks omitted).[7]

McAndrew further testified that he moved Thornton off of X-wing and away from areas where he thought Thornton would have opportunities to abuse inmates. McAndrew testified that shortly after he became warden he wanted to terminate Thornton. McAndrew described Thornton as "an extremely dangerous person. . . . [T]his guy's a walking hand grenade . . . and the pin's pulled." McAndrew specifically told Crosby "this guy is dangerous. . . . You need to get him off the payroll." However, McAndrew only reprimanded Thornton based in part on the advice of two of his subordinates, who advised McAndrew that Crosby (who at the time was the state corrections department Director of Security and Institutional Management), had called them to intervene on Thornton's behalf to ask that he be

---

[7] In Skrtich, we held that several of the officer defendants in this action were not entitled to qualified immunity for the alleged beating of Skrtich. Skrtich, 280 F.3d 1295.

14

given every possible consideration. Deputy Warden A.D. Thornton, no relation to Timothy Thornton, similarly testified that both he and McAndrew had concerns about Timothy Thornton. Notwithstanding McAndrew's briefing on Thornton, after Crosby became the FSP warden, Timothy Thornton was promoted to Captain, was permitted to work on X-wing, and was personally selected by Crosby to receive preferential staff housing. In his deposition, McAndrew summarized Crosby's approach to Thornton as "[Crosby was] told he has a potential killer on his hands and he promotes the guy from lieutenant to captain."

McAndrew further testified that he asked Crosby to sit with him for a "desk audit" to review all issues and problems McAndrew was passing on to Crosby. He wanted to have the "desk audit" with Crosby because FSP "had a notorious reputation for the beating of inmates" and McAndrew was attempting to address the problem. Crosby, however, said he did not have time or was not interested in meeting for the "desk audit."

A.D. Thornton also testified that Crosby was instrumental in bringing Montrez Lucas to FSP from another correctional institution where he had worked with Crosby. Lucas, who is also named as a defendant in this suit for allegedly participating in the beating death of Valdes, had been disciplined before being brought to FSP by Crosby. Lucas bragged about how he had been suspended for

15

using excessive force against an inmate but had not been terminated for it. In addition, Lucas was investigated shortly after Valdes' death for teaching correctional officer trainees improper practices in June 1999, prior to Valdes' death. The Department of Corrections investigation report stated that Lucas taught the following techniques: taking "free shots" at inmates while they were handcuffed, using chemical agents on inmates without the required notice and even after inmates became compliant, reviewing medical reports before completing use of force forms to ensure conformity between the two, instructing trainees about which areas of the human body could be kicked without leaving bootprints, and bringing inmates to the medical ward for treatment of minor injuries and then beating the inmates severely after they had been returned to their cells.

McAndrew stated that while he was warden he hired an "assistant warden who was aggressively helping fight the excessive use of force in the prison." McAndrew specifically hired this assistant warden because he believed the assistant warden could be trusted and would actively pursue McAndrew's goals of reducing inmate abuse. When Crosby became warden, he "transfer[red] her out to another prison."

Additionally, evidence was presented that FSP, like most facilities, had procedures for extracting inmates from their cells when they refused to submit to

16

being restrained by handcuffs and leg irons.  On X-wing, cell extractions consisted of four or five officers using the physical force necessary to restrain and remove an inmate from his cell.  Cell extractions and any other use of force were to be documented by prison officials.  Copies of the use of force forms were forwarded to the warden.

Prior wardens at FSP required officials to videotape cell extractions. Warden McAndrew testified that his predecessor at FSP suggested videotaping cell extractions as a method to cut down on problems during uses of force.  McAndrew testified that FSP had a "notorious reputation" as an institution where guards beat the inmates, and he continued videotaping because he felt staff were more likely to act professionally and inmates were less likely to resist the commands of the guards when they knew they were being videotaped.  When Crosby became warden, however, he discontinued the practice of videotaping cell extractions. Viewing all facts and inferences in the light most favorable to Valdes, it could be inferred that Crosby's action in discontinuing the use of the cameras once he became Warden, despite knowledge that specific FSP officers were suspected of unwarranted assaults upon inmates, sent a message to corrections officers that the administration at FSP was going to permit further abuse of inmates.[8]

---

[8] In a March 25, 1999, meeting of FSP supervisory personnel allegedly attended by Crosby, there was a discussion about the frequency with which certain officers were being

17

Reverend Andrew MacRae, an FSP prison chaplain from 1994 until August 1999 testified about the marked difference in the culture at FSP after Crosby became the warden. MacRae testified that although he never witnessed an inmate being physically abused during any warden's administration, Crosby had a more "hands-off" approach than prior wardens had, thus permitting the "good old boys" network of guards to mistreat inmates. MacRae testified that after Crosby became warden, there were occasions when MacRae was prevented from seeing inmates following uses of force – which previously had been a time that he would often offer counsel to those inmates. MacRae was also familiar with the practice of "touching up" an inmate, wherein an inmate would be subjected to minor injuries during an apparently justifiable use of force and then, following corroboration of the injuries by the medical facility, the inmate would be returned to X-wing and beaten. MacRae testified that he believed these instances increased during Crosby's tenure because of Crosby's hands-off approach.

Evidence was also provided regarding the manner in which Crosby handled abuse of force complaints from inmates. FSP's procedures relating to prisoners' abuse of force complaints required inmates to report an accusation on a grievance form that would then be forwarded to the Inspector General's central office via an

accused of abusing inmates and what steps might be taken to remedy the situation.

18

on-site prison inspector's report. The central office would review the reports and respond to the on-site prison inspector regarding what further action, if any, should be taken by the inspector. Copies of the inspector's report to the central office and copies of the central office's response would be forwarded to the warden. The central office also would receive inquiries about prison conditions from persons outside the prison, such as an inmate's family or government officials whom an inmate or his family may have contacted. Copies of the documentation of such inquiries and directions about what action would be taken were also forwarded to the warden.

Evidence was submitted that despite having the abuse of force complaints and use of force forms forwarded to him, Crosby did not read them. Rather, Crosby delegated the responsibility of handling the complaints to his secretary, who had no law enforcement background. In his deposition, McAndrew stated that he had "reasons" to believe that the secretary was obstructing inmate abuse investigations. McAndrew told Crosby about his concerns relating to the secretary. Nonetheless, Crosby delegated the responsibility for reviewing and acting on inmate complaints to the secretary. Nearly all of the inmate-related correspondence set forth below regarding alleged abuse contained notations of an "r" next to Crosby's initials, which Crosby testified indicated that his secretary

may have handled the matter without him becoming involved or having specific knowledge of the complaints or the secretary's responses.

Included in the numerous complaints and inquiries sent to Crosby between December 1998 and July 1999 were a reference to an inmate's complaint that he was "being maliciously harassed and threatened by staff" who "threatened to kill" the inmate and that his efforts to remedy the issue at the institutional level had been "to no avail"; an inmate's complaint that officers were falsifying disciplinary reports against him as a means to keep him in close management confinement; a complaint from an inmate's spouse stating that FSP staff had locked her husband in a stripped cell, were depriving him of food and were "threatening to physically abuse" him; an inmate's letter "concerning drug dealing and physical abuse by staff" which also notes that the Department of Corrections agreed to take steps to ensure that the inmate's safety would not be jeopardized because of his testimony as a witness; an inquiry on behalf of an inmate's family members who were "concerned about the inmate's safety since they allege he was beaten by [a sergeant and] was taken to the hospital for sustained injuries" and had not had contact with him since; an inmate who wrote "alleging fear for [his] life and wishing to file a complaint against four officers" he stated were "trying to kill [him]"; a letter from another inmate who complained of being "harassed and threatened by both staff

and other inmates" as a result of his status "as a witness for the State Attorney's Office"; an inquiry on behalf of an inmate who feared for his safety at FSP because he had murdered a corrections officer at another Florida correctional institute more than 15 years earlier; a letter from a death row inmate to the Florida Department of Law Enforcement, asking it to investigate his claims that supervisory staff at FSP failed to investigate allegations that prison officials assigned to death row permitted a violent inmate to be out of his cell without restraints so that he could threaten and intimidate other inmates; letters from several different inmates claiming that corrections officers had threatened to kill them; and a letter on behalf of an inmate discussing allegedly criminal acts committed by various guards, and questioning the need for officers to continue to use force against an inmate once he has already been restrained by handcuffs and shackles.

Valdes also referenced an inmate request form received by Crosby on June 16, 1999 – a month prior to Valdes' death – which reads, in relevant part:

TO: Superintendent
FROM: Inmate Name: Seburt Connor
Inportant [sic] message to Mr. Warren [sic] James Crosby. The Superintendent. Please remove Mr. Frank Valdez [sic] from X Wing! His life can be in danger! I was told by one of the guards! That he is going to die! But please don't call my name! Cause my life can be in danger too!! I have already seen an attemp [sic] on his life! I repeat don't say where you get this information! They might try to kill me too! Please note, these are the mens [sic] that I [have] seen tortureing [sic] Mr. Frank Valdez [sic][as] follows?

21

Connor's letter then lists the names of four officers (none of whom are defendants here) who allegedly kicked Valdes while he was face down with his arms handcuffed behind his back and a chain around his waist, while they held a wet towel over his mouth and nose and restrained his feet.

A few days before Valdes died, Crosby received notice of potential inmate abuse involving another X-wing inmate, Willie Mathews. Mathews had arrived at FSP on July 4, 1999 along with four other inmates from Hamilton Correctional Institution following a riot at Hamilton in which several guards were seriously injured. At FSP, Mathews was placed in isolation on X-wing. On or before July 13, 1999, Crosby was called by Mathews' mother who reported that she had received a letter from an officer working at the prison who wrote that her son, Mathews, was in danger and was being abused by prison guards. The prison inspector testified that he "had conversations with [Crosby] every day on everything going on at FSP" and that, therefore, the inspector was "almost positive" that by July 13, 1999, Crosby was aware of Mathews' allegations that he was being attacked on X-wing. The inspector later testified that he was "sure somewhere between the 13th and the . . . 16th [the day before Valdes was killed]" of July 1999, he "spoke with [Crosby] . . . concerning the Mathews allegations."

On July 15, 1999, two days before Valdes died, Mathews filed an emergency

22

grievance stating that he was in fear for his life and was suffering from an untreated broken jaw following repeated brutal assaults by prison guards on X-wing. The senior officer present during one of the beatings of Mathews was Timothy Thornton. Mathews urged authorities to send someone to come get him and the other inmates who had come from Hamilton "before we are killed." By July 16, 1999, the inspector was advised by dental staff that Mathews had a fractured jaw and the inspector apparently reported this information to the acting warden, A.D. Thornton. No use of force form was ever filed which might have explained Mathews' injury.

Finally, there was evidence that wardens maintain the authority to transfer an inmate to another prison or to another location within the prison and to reassign an officer from one area of the prison to another. Moreover, in Florida, wardens are charged with the duty to supervise, discipline, and enforce all orders, rules and regulations of the corrections department. Fla. Stat. § 944.14.[9] The warden also has the authority to take measures to attempt to reduce instances of prisoner

---

[9] As stated by the district court:

> The parties failed to fully develop the record regarding the extent of the warden's authority in implementing these duties and there is some ambiguity in the evidence as to whether a warden has the authority to terminate a corrections officer.

Valdes, 390 F. Supp. 2d at 1089 n.6.

23

mistreatment, including increasing training of prison officials, videotaping cell extractions, and rotating officers.

C.

We find that all of this evidence, when taken together, is more than adequate to entitle Mario Valdes to proceed to trial and show that inmate abuse at the hands of guards was not an isolated occurrence, but rather occurred with sufficient regularity as to demonstrate a history of widespread abuse at FSP. Whether Crosby actually drew the inference of widespread abuse and was therefore "on notice of the need to correct or to stop" abuse by officers then becomes a factual question for the jury. Cottone, 326 F.3d at 1362.

We also agree with the district court that this evidence, again taken together and in the light most favorable to Valdes, is sufficient to allow a jury to consider whether Crosby had established customs and policies that resulted in deliberate indifference to constitutional violations and whether Crosby failed to take reasonable measures to correct the alleged deprivations. Cottone, 326 F.3d at 1360; see Miller, 384 F.3d at 1263 (finding that plaintiff had created a triable issue as to whether warden was liable either personally or in his supervisory capacity based on warden's knowledge of inmate's conditions and his failure to exercise authority as warden to ensure that guards corrected the conditions); Smith v.

24

Brenoettsy, 158 F.3d 908, 912-13 (5th Cir. 1998) (dismissing warden's appeal of denial of summary judgment in light of factual disputes as to warden's knowledge of substantial risk and reasonableness of warden's response where plaintiff, who was stabbed by a prison guard, sent letters to warden complaining of verbal abuse and threats by guard, and warden responded that sheer volume of unsubstantiated complaints made investigation of every complaint unreasonable).

## II.  Clearly Established Law

Crosby argues that even if Mario Valdes established a constitutional violation, he is protected by qualified immunity because while it may have been clearly established that Valdes' constitutional rights would be violated if he were beaten to death by guards using excessive force, it was not clearly established at the time of Valdes' death that a warden could face liability under § 1983 predicated on his failure to take reasonable steps in the face of a history of widespread abuse or his adoption of custom or policies which result in deliberate indifference.  We disagree.  At the time of Valdes' death in 1999, it was clearly established that a warden, the person charged with directing the governance, discipline, and policy of the prison and enforcing its orders, rules, and regulations, would bear such liability.  See, e.g., LaMarca v. Turner, 995 F.2d 1526, 1539 (11th Cir. 1993) (holding that prison warden could face liability when his failure to take appropriate

25

measures to improve prisoner safety created a climate which preordained the violence which ensued); Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir. 1985) (holding safety director whose responsibilities included disciplining police officers and setting police department policy could be liable for failing to take corrective steps in the face of pattern of excessive force engaged in by officers); see also Skrtich, 280 F.3d at 1303 (stating that by 1998 "precedent clearly established that government officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated"); Bruce v. Wade, 537 F.2d 850, 853 (5th Cir. 1976) (a violation of § 1983 is clearly stated by the unjustified beating of an inmate at the hands of prison officials).

## CONCLUSION

Accordingly, the order of the district court is **AFFIRMED**.