[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 21-14275

————————————————

BETTY WADE,
in her capacity as Personal Representative of the Estate of David
Henegar,

Plaintiff-Appellant,

*versus*

CINDY MCDADE, et al.,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 4:18-cv-00192-AT

————————————————

Before NEWSOM, LUCK, and TJOFLAT, Circuit Judges.

NEWSOM, Circuit Judge:

Over a four-day stretch during his incarceration at Walker State Prison in Georgia, David Henegar failed to receive his pre-scribed seizure medication. On the fourth night, Henegar had two seizures that he claimed caused permanent brain damage. Pro-ceeding under 42 U.S.C. § 1983, Henegar sued five prison employ-ees—Lieutenant John Stroh and Sergeant Jerome Scott Keith, as well as nurses Sherri Lee, Julie Harrell, and Cindy McDade—alleg-ing that they were deliberately indifferent to his medical needs in violation of the Eighth Amendment.

The district court granted summary judgment to all five de-fendants on the ground that they were entitled to qualified immun-ity. Shortly thereafter, Henegar died from causes unrelated to the seizures that he suffered while in prison. Betty Wade—Henegar's sister and the personal representative of his estate—assumed re-sponsibility for his suit, and on appeal contended that the district court had erred in granting the defendants summary judgment.

We affirmed the district court's decision, concluding that Wade hadn't shown that the prison officials violated Henegar's Eighth Amendment rights. *See Wade v. McDade*, 67 F.4th 1363, 1374–78 (11th Cir. 2023), *vacated and reh'g en banc granted sub nom. Wade v. Georgia Corr. Health, LLC*, 83 F.4th 1332 (11th Cir. 2023), and *on reh'g en banc*, 106 F.4th 1251 (11th Cir. 2024). In the course of so doing, we called attention to a deep and entrenched

intracircuit split concerning the mens rea requirement necessary to make out a deliberate-indifference claim. *Id.* at 1371–72.

To clear the confusion and to determine once and for all the necessary elements of a deliberate-indifference claim, a majority of the active judges of this Court voted to rehear this case en banc. *See Wade v. Georgia Corr. Health, LLC*, 83 F.4th 1332 (11th Cir. 2023). On rehearing, the en banc Court articulated—in accordance with the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825 (1994)—the following standard for establishing liability on an Eighth Amendment deliberate-indifference claim:

> 1. *First . . .*, the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, objectively, sufficiently serious.

> 2. *Second*, the plaintiff must demonstrate that the defendant acted with subjective recklessness as used in the criminal law, and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat . . . that even if the defendant actually knew of a substantial risk to inmate health or safety, he cannot be found liable under the Cruel and Unusual Punishments Clause if he responded reasonably to the risk.

*Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (citations and quotation marks omitted).    The en banc Court

"remand[ed] to the panel for the application of this standard to the facts of this case." *Id.*

Applying the newly clarified standard to each of the five defendants, we now hold that none of them was deliberately indifferent to Henegar's medical needs and, therefore, that none of them violated the Eighth Amendment. Accordingly, we affirm the district court's decision granting summary judgment to all five defendants.

## I

### A

Because this case comes to us on appeal from a decision granting summary judgment, "we must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997). We therefore construe the facts in Wade's favor, noting factual disputes—overwhelmingly here, between and among the various defendants—where necessary.

Because the facts underlying this case on remand haven't changed, we will simply repeat verbatim our earlier description of them:

While serving his sentence at Walker State Prison, Henegar was diagnosed with epilepsy. Initially, his condition was well-controlled with a daily anticonvulsant called Dilantin. The epileptic episode at issue here followed a four-day period—from Sunday,

21-14275                Opinion of the Court                5

August 28, to Wednesday, August 31, 2016—during which Henegar didn't receive his medication.

First, a brief introduction of the five defendants:  Nurses Julie Harrell and Sherri Lee worked the day shift on weekdays in the prison medical unit.  As relevant here, both were on duty from Monday, August 29, through Thursday, September 1.  Lieutenant John Stroh and Sergeant Jerome Scott Keith both worked the night shift on Sunday, August 28, when Henegar missed his first dose of Dilantin, and then didn't return to work until the evening of Wednesday, August 31.  Nurse Cindy McDade was the nursing manager; the parties agree that she never treated Henegar or saw or spoke to him during the four days in question.

In August 2016, Nurse Mary Ann Melton, who isn't a party to this litigation, was responsible for ordering inmates' medications.  She worked at the prison until Saturday, August 25, at which point she went on medical leave for several months.  Nurse Melton usually ordered refills of inmates' medications from the Georgia Department of Corrections' pharmacy shortly before they ran out.

On Thursday, August 23—just before going on leave—Nurse Melton ordered Henegar's Dilantin.  Medications ordinarily arrived within one to two business days, and almost always within three.  For reasons still unknown, Henegar's Dilantin wasn't delivered until sometime after Wednesday, August 31.  Typically, if a prisoner's medicine didn't arrive as expected, Nurse Melton would follow up with the pharmacy.  In Nurse Melton's absence, Nurse Harrell ordered medications, recorded them in a binder when they arrived,

cross-checked to ensure all orders had been delivered, and inventoried and stocked the prison's "pill cart." Nurse McDade occasionally helped order and stock medicines, but it typically fell to Nurse Harrell to cover Nurse Melton's duties.

As it turns out, despite the delay in the delivery of Henegar's Dilantin, the prison had the medication on hand; there was a backup supply in the medical department's "standard ward inventory." All nurses had access to that supply, and any nurse could also obtain Dilantin on short notice from a local pharmacy. Corrections officers, by contrast, didn't have access to the backup supply and couldn't order new medicines.

There were four "pill calls" each day at regular intervals—5:00 a.m., 11:00 a.m., 4:00 p.m., and 9:00 p.m. Henegar was assigned to receive his medication at the 9:00 p.m. call. During regular hours on weekdays, nurses administered inmates' medicines; Nurse Lee, for instance, conducted the 5:00 a.m. pill call each morning. At night and on weekends, though, no medical personnel were onsite, so corrections officers distributed medications. During those pill calls, an officer would review a prisoner's medication administration record ("MAR") to determine what medicine he needed and then retrieve it from the pill cart. If there was an issue with distributing or administering an inmate's medication, the officer was supposed to make a notation to that effect in his MAR. Standard notations included "A" for "administered," "N" for "no-show," "R" for "refused," and "A/W" for "accepted but wasted."

21-14275                Opinion of the Court                7

When Henegar attended the 9:00 p.m. pill call on Sunday, August 28, his Dilantin wasn't on the cart. Lieutenant Stroh was supervising that night, and Sergeant Keith, who was administering the pill call, made an "unidentifiable marking" in Henegar's MAR. It wasn't one of the four standard notations that officers had been trained to use in MARs.

Having missed his August 28 dose, Henegar returned to the 9:00 p.m. pill calls on August 29 and 30, to no avail. As already explained, both Lieutenant Stroh and Sergeant Keith were off those days. The corrections officers who conducted those pill calls put "question marks" in Henegar's MAR. It is undisputed that "it would be unusual for [a question mark] to appear in the medication [b]inder." Although we don't know who, someone also put a post-it note on Henegar's file to indicate that there had been a problem with administering his medication—the parties agree that it "st[uck] out . . . like a flag" from Henegar's file in the pill cart.

At some point on either August 29 or 30, Henegar also attended a daytime pill call but still didn't receive his Dilantin. He spoke to a nurse at the time, although he couldn't remember exactly when or which one. The only nurses working daytime pill calls on those days were Nurses Harrell and Lee. Nurse Harrell admits having inventoried the pill cart at least once during the days when Henegar went without his medication and checking the binder of prescription deliveries daily. Nonetheless, she insists that she didn't know that Henegar was out of his Dilantin.

On Wednesday night, August 31, Lieutenant Stroh and Sergeant Keith were back on duty together, and Sergeant Keith once again conducted the 9:00 p.m. pill call.  When Henegar showed up and his Dilantin still wasn't on the pill cart, Sergeant Keith recorded another question mark in the MAR.  One of the two officers told Henegar to go to the sick bay the following morning.

At 10:50 p.m. that same day, having been without his Dilantin for four days, Henegar suffered a nearly 20-minute seizure that induced status epilepticus—a condition that can cause brain damage.  The resulting injury usually centers in the hippocampus, which regulates memory and mood.  The on-call doctor didn't answer Lieutenant Stroh's call, so he phoned Nurse McDade, who instructed him to call 911.  Henegar was transported to the emergency room, treated, and returned to the prison at around 2:30 a.m. on September 1.

Just two hours later, Henegar suffered another seizure that left him oxygen-deprived for about 20 minutes.  When Lieutenant Stroh and Sergeant Keith arrived at Henegar's cell, his seizure had subsided.  Lieutenant Stroh called Nurse McDade again at home to report the incident, and she told him to have Nurse Lee examine Henegar when she arrived.

When Nurse Lee arrived at the prison around 5:00 a.m., she took Henegar to the medical unit, examined him, and found that his oxygen level was 81%—a low but not critical level—and that his pupils were slow to dilate but otherwise functioning correctly.  She

determined that he needed supplemental oxygen and additional seizure-prevention measures, so she sent him back to the hospital.

Later that day, Nurse McDade investigated the incident and contacted the pharmacy to ensure that Henegar's Dilantin was delivered. She also switched administration of all anti-seizure medications from the 9:00 p.m. pill call to the 4:00 p.m. pill call so that nurses, rather than corrections officers, would be in charge of distribution. Nurse McDade reports that a similar situation had never occurred before.

Following the August 2016 incident, Henegar regularly received his medication until his release a year later. The defendants all but acknowledge that a breakdown in communication between nurses, the pharmacy, and corrections officers caused Henegar's injuries. After his release, Henegar began to struggle with his short-term memory, finding himself unable to remember everyday conversations and keep up with his welding job. He came to rely on his mother, with whom he lived, to remind him about medical appointments, and he suffered strained relationships because he was no longer able to regulate his emotions.

★  ★  ★

One last "factual" issue: There's a fair amount of finger-pointing among the defendants. For instance, Nurse McDade insists that she trained corrections officers to communicate with nurses about an inmate's medication *both* "through the MAR and verbally." (For her part, Wade likewise alleges that the officers had been trained to contact the on-call nurse immediately when a

question about medication arose.)  And it is undisputed that neither Sergeant Keith nor Lieutenant Stroh called a nurse immediately when Henegar initially missed his medication on August 28.

Lieutenant Stroh and Sergeant Keith respond in three ways. First, they say—and all agree about this much—that they believed (even if incorrectly) that the medical staff reviewed their notations in the MARs every morning, although Nurse McDade rejoins that she didn't train them to think that.  Second, the officers assert that they considered it an inmate's responsibility to notify the medical staff if his medicine was unavailable and that officers were supposed to communicate with the medical staff exclusively through MARs.  Sergeant Keith, in particular, testified that his practice was to contact the on-call nurse only when there were discrepancies with a prisoner's medication—say, if a pill on the cart didn't match the prisoner's prescription—not when medication was missing entirely.  Finally, Sergeant Keith claims (1) that he *did* tell at least one nurse verbally about the problem either late on August 28 or early on August 29, (2) that it must have been Nurse Lee because she was the only one whose shift overlapped with his, and (3) that, in any event, the nurse with whom he spoke told him that Henegar's Dilantin was "on order."

In return, the nurses seek to shift blame back to the officers. For instance, Nurse Lee denies that Sergeant Keith ever told her about Henegar's missing Dilantin.  And more generally, all of the nurses deny that either Lieutenant Stroh or Sergeant Keith told

them anything—they insist that they were completely unaware that Henegar was out of Dilantin.

The nurses also point fingers at one another. Nurse Melton, for instance, testified that it was Nurse Lee's responsibility to check the MARs from the previous night's 9:00 p.m. pill call to determine whether there had been medication-related problems. Wade agrees that Nurse Lee was supposed to check the MARs and, accordingly, that she either knew or should have known that Henegar had been missing his Dilantin doses. Nurse Lee, naturally, denies that it was her responsibility either (1) to review the previous night's or weekend's MARs or (2) to communicate with corrections officers or solicit reports on the nighttime pill call. For her part, Nurse McDade testified that she didn't double-check to ensure that line nurses were reviewing the nighttime MARs or the medication-order binder because she didn't want to "micromanage" them.

## B

Henegar sued Lieutenant Stroh, Sergeant Keith, and Nurses Harrell, Lee, and McDade under 42 U.S.C. § 1983, alleging that each of them had been deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The district court granted summary judgment to all defendants on the ground that each was entitled to qualified immunity. In particular, the court held that even if one or more of the defendants had violated the Constitution, the law in August 2016 was insufficiently "clearly established" to give them fair notice of the unlawfulness of their conduct: "Assuming Defendants' conduct here constituted deliberate

indifference to a serious medical need in violation of Plaintiff's Eighth Amendment rights, Plaintiff ha[d] failed to point to any law applicable to the circumstances presented in this case that clearly established the alleged violation of Plaintiff's rights."

Henegar's sister, Betty Wade, assumed responsibility for his suit following his death, and on appeal she contends that the district court erred in granting the defendants summary judgment.[1]

On remand from the en banc Court's decision clarifying the proper Eighth Amendment deliberate-indifference standard, we must determine (1) whether, in addition to an objectively serious deprivation, Wade has demonstrated that the defendants here actually knew that their conduct (whether acts or omissions) put Henegar at substantial risk of serious harm and (2) whether, even if they did, they are nonetheless protected from liability on the ground that they responded reasonably to that risk. *See Wade*, 106 F.4th at 1253.

For reasons we'll explain, we hold that, under this standard, Wade failed to prove that any of the five defendants was deliberately indifferent to Henegar's medical needs in violation of the Eighth Amendment. Accordingly, all five defendants are entitled to qualified immunity.

---

[1] We review a district court's grant of summary judgment de novo. *See Stewart*, 117 F.3d at 1285.

## II

A government official sued under § 1983 may defend on the ground that he or she has qualified immunity from suit. "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Because all agree that the defendants here were at all relevant times performing discretionary functions of their offices, *see Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018), Wade has the burden both (1) to "make out a violation of a constitutional right" and (2) to show that the right that she claims the defendants violated was "clearly established at the time of [their] alleged misconduct." *Pearson*, 555 U.S. at 232 (quotation marks omitted).

A reviewing court may consider the two prongs of the qualified-immunity standard in either order. *Id.* at 236. As already explained, the district court here bypassed the first prong—"[a]ssuming" that the defendants had violated the Eighth Amendment—in favor of deciding the case on the ground that Wade hadn't shown that applicable law was "clearly established." We think it best—and find that we are able—to resolve the case on the first, "violation" prong.

★  ★  ★

In relevant part, the Eighth Amendment forbids the "inflict[ion]" of "cruel and unusual punishments." U.S. Const. amend.

VIII.  The Supreme Court first held in *Estelle v. Gamble* that the Cruel and Unusual Punishments Clause should be understood to prohibit "deliberate indifference to serious medical needs of prisoners."  429 U.S. 97, 104–05 (1976).  As it has evolved in the years since *Estelle*, a deliberate-indifference claim has come to entail both an objective and a subjective component.  *See Keohane v. Florida Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020).  As an initial matter, the plaintiff-inmate must establish an "objectively serious medical need."  *Id*. (citation omitted).  It is undisputed, as relevant here, that an unmedicated seizure disorder satisfies that objective threshold.

In addition, the plaintiff must prove that the defendant "acted with 'subjective recklessness as used in the criminal law,'" *i.e.*, that the defendant "actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm."  *Wade*, 106 F.4th at 1253 (quoting *Farmer*, 511 U.S. at 839).  There is a "caveat," however:  Even if the plaintiff makes that showing, however, a defendant "cannot be found liable under the Cruel and Unusual Punishments Clause if he 'responded reasonably to th[at] risk.'"  *Id*. (alteration in original) (quoting *Farmer*, 511 U.S. at 844).

We'll apply the en banc Court's recently articulated deliberate-indifference standard to each of our five defendants in turn.

## A

We begin with the corrections officers—Lieutenant Stroh[2] and Sergeant Keith.  Our analysis of Wade's claim against Lieutenant Stroh is straightforward:  Wade failed to demonstrate that Lieutenant Stroh had subjective knowledge of a "substantial risk of serious harm" to Henegar *at all*—let alone one caused by his own conduct.  *Wade*, 106 F.4th at 1262.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ."  *Farmer*, 511 U.S. at 842.  Here, Lieutenant Stroh consistently testified that he didn't "have a sense of urgency" about Henegar's missing medication because his son—who also suffered from epilepsy—could miss doses of his seizure medication without incident.  So while Lieutenant Stroh acknowledged that he knew that an unmedicated seizure disorder constituted a serious health risk, he didn't know that missing medication for just a few days could *produce* that risk.  Because he lacked the requisite subjective knowledge of a substantial risk, Lieutenant Stroh was not deliberately indifferent to Henegar's medical needs, and the district court correctly granted him summary judgment.

---

[2] Although Lieutenant Stroh was Sergeant Keith's supervisor, "[i]t is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."  *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (citation and quotation marks omitted).  Accordingly, our review is limited to the question whether Lieutenant Stroh *himself* exhibited deliberate indifference to Henegar's serious medical needs.

Next, Sergeant Keith. It's undisputed that Sergeant Keith made MAR notations on the first and fourth nights that Henegar missed his Dilantin in an attempt to signal problems with administering his Dilantin and that he believed (even if incorrectly) that the nurses generally reviewed MAR notations. The defendants dispute among themselves, though, whether Sergeant Keith ever told a nurse. Construing the facts in the light most favorable to Wade, we'll assume that he never verbally told a nurse about the problem as (we'll also assume) he had been trained to do.[3] But this shows, at most, that he was subjectively aware of a substantial risk, not that the risk was *caused by his own conduct*. *See Wade*, 106 F.4th at 1262. Accordingly, the district court correctly granted him summary judgment as well.

## B

Nurses Harrell and Lee are closer calls. Circumstantial evidence—which *Farmer* says we may consider and from which we may draw reasonable inferences—indicates that both knew that

---

[3] Wade asks us to consider alternate theories of liability in her favor. So, for instance, she says that when considering her claim against Sergeant Keith, we should assume that he did *not* tell a nurse that Henegar's Dilantin was missing, as he had been trained to do—which would render him more culpable. But, she says, when considering her claim against Nurse Lee, we should assume that Keith did tell her and that she did almost nothing in response—which would render her more culpable. We agree that she is entitled to argue alternate theories of liability at summary judgment, so we draw both reasonable inferences. *Brookhaven Landscape & Grading Co. v. J.F. Barton Contracting Co.*, 676 F.2d 516, 523 (11th Cir. 1982) ("Litigants in federal court may pursue alternative theories of recovery, regardless of their consistency.").

Henegar wasn't getting his Dilantin, and we may further assume that, as medical professionals, both knew that he faced a risk of serious harm without it.

Nurse Harrell, in particular, doesn't dispute either that she staffed the daytime pill calls on three of the four days that Henegar missed his medication or that he attended at least one daytime pill call during those days. She also admits that she inventoried the pill cart at least once during those days—on either Monday, August 29, or Wednesday, August 31—and that an unusual post-it note had been attached to and was protruding from Henegar's MAR during that period.

As to Nurse Lee, we must assume that she was supposed to check the previous night's MARs to determine whether there were problems with administering an inmate's medications. And taking the facts in the light most favorable to Wade vis-à-vis Nurse Lee, we must also assume that Sergeant Keith actually told her either late on Sunday or early on Monday that Henegar was missing his medication.

Construing the facts in Wade's favor, we can reasonably infer that Nurse Harrell and Nurse Lee knew about the backup Dilantin supply, had access to it, and had the ability to order medications from either the prison-system pharmacy or a local pharmacy. And yet no one suggests that either attempted to order or obtain backup Dilantin for Henegar. But even assuming that this is sufficient to establish both that Nurses Harrell and Lee were subjectively aware of the substantial risk of harm to Henegar and that their own

conduct created that risk, we conclude that *Farmer*'s "caveat" protects them from liability here.  *Wade*, 106 F.4th at 1253, 1262.

Importantly, Henegar testified that when he told the daytime-pill-call nurse that he was out—he couldn't remember who it was—she responded that his Dilantin was "on order" from the prison system's pharmacy.  And Sergeant Keith, of course, said that Nurse Lee responded the same way—that the medicine "had been ordered"—when he told her that Henegar's Dilantin had run out.

These facts show that both Nurse Harrell and Nurse Lee—aware that Henegar was missing his Dilantin—checked to ensure that it would be arriving soon and reported that it was "on order." The nurses' decision to wait on the Dilantin to be delivered—which typically took one to two (at most three) business days—rather than to obtain a substitute dose from the supply closet or a local pharmacy may have been (in hindsight) regrettable, but we cannot say that it was *unreasonable*.  Because *Farmer* makes clear that a defendant "cannot be found liable under the Cruel and Unusual Punishments Clause" if she "responded reasonably to the risk," Nurses Harrell and Lee are not liable here.  *Farmer*, 511 U.S. at 844–45. Therefore, the district court properly granted them summary judgment.

## C

Wade's claim against Nurse McDade is different in that it names her in her supervisory capacity, and therefore our assessment of her liability remains the same as before.

Where, as here, there is no allegation that a supervisor "personally participated" in any wrongdoing, she can be held liable only if she "instigated or adopted a policy that violated [the plaintiff's] constitutional rights." *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995). We have emphasized that "[t]he standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Florida Dep't of Lab. & Emp. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998).

Policy-based supervisory liability can result either where a challenged policy is unconstitutional on its face or where it is "implemented in an unconstitutional manner." *See Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007). To succeed on an implementation-based challenge, a plaintiff must show, among other things, that the supervisor "had actual or constructive notice of a flagrant, persistent pattern of violations." *Id.*

Wade challenges two of Nurse McDade's policies. First, she targets the MAR policy. Nurse McDade, of course, insists that she trained the officers to call a nurse immediately if a problem arose dispensing an inmate's medication; Lieutenant Stroh and Sergeant Keith deny that she did so. Construing the facts in the light most favorable to Wade vis-à-vis Nurse McDade, we will assume that she didn't train the officers to contact a nurse if they encountered medication-related issues and that her system relied entirely on MAR notifications. Even so, an MAR-only policy—while not ideal—is not deliberately indifferent on its face. It would not, as Wade asserts, necessarily "fail[ ] to ensure that [Lieutenant] Stroh

and [Sergeant] Keith had an effective mechanism to communicate with medical at times when there were no medical staff on duty." Br. of Appellant at 30–31; *see Goebert*, 510 F.3d at 1332 (holding that a "policy of not permitting inmates to lie down at their leisure during the daytime" was "certainly [ ] not facially unconstitutional" in a case involving a pregnant woman who, when denied an exemption, suffered a miscarriage). That is especially true given the undisputed fact that there was a medical staff member on call.

Second, Wade alleges that Nurse McDade was deliberately indifferent for "failing to properly ensure her subordinates, [Nurses] Lee and Harrell, searched the MARs daily for communications from security, or otherwise check to be sure all medications were on the pill cart." Br. of Appellant at 31. To the extent that Wade assails that policy on its face, her challenge fails. It was not facially deliberately indifferent for Nurse McDade to expect subordinates to check MARs daily without looking over their shoulders, especially given that she had established an elaborate system of ordering, cross-checking, and inventorying the pill cart to ensure that each inmate received his medicine. *Cf. Goebert*, 510 F.3d at 1332.

We likewise reject any implementation-based challenge, although doing so requires a bit more explanation. For implementation-related deliberate-indifference claims, "[w]e apply a three-prong test to determine a supervisor's liability: (1) whether the supervisor's failure to adequately train and supervise subordinates constituted deliberate indifference to an inmate's medical needs; (2) whether a reasonable person in the supervisor's position would

understand that the failure to train and supervise constituted deliberate indifference; and (3) whether the supervisor's conduct was causally related to the subordinate's constitutional violation." *Poag*, 61 F.3d at 1544. Here, for reasons we will explain, Wade cannot meet the third, causation element; accordingly, her challenge fails.

For our purposes, a causal connection is shown when: (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) "a supervisor's custom or policy . . . results in deliberate indifference to constitutional rights"; or (3) "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (alteration accepted) (citations and quotation marks omitted), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). None of those requirements is satisfied here.

First, Wade hasn't alleged any facts to indicate that there was a "history of widespread abuse" sufficient to put Nurse McDade on "actual or constructive notice of a flagrant, persistent pattern of violations." *Goebert*, 510 F.3d at 1332 (citation omitted). It is undisputed (1) that Henegar's condition was well-controlled before the incident that underlies this case and (2) that he received his medication regularly thereafter until his release. And Wade has

pointed to no evidence of a pattern of similar violations with respect to other inmates, either.

Second, and for similar reasons, there is no evidence that a policy of trusting subordinates to monitor the MARs and manage the pill cart generally "results in deliberate indifference to constitutional rights." *Cottone*, 326 F.3d at 1360 (alteration accepted) (citation and quotation marks omitted).  Lieutenant Stroh testified that in 23 years at the prison, it was not "typical" for medication to be missing, McDade testified that no comparable situation had ever occurred, and Wade has alleged no facts to the contrary.  Though failing to double-check subordinates' work might open cracks in the system to accidents and oversights, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.  *Compare, e.g.*, *Doe v. School Bd. of Broward Cnty.*, 604 F.3d 1248, 1266 (11th Cir. 2010) (holding that allegations that supervisors had been aware of "two instances of sexual harassment" were insufficient to "show the requisite causal connection" for deliberate-indifference purposes), *with, e.g.*, *Valdes v. Crosby*, 450 F.3d 1231, 1243–44 (11th Cir. 2006) (holding that plaintiff's deliberate-indifference claim against prison warden survived summary judgment when warden had received at least 13 complaints and inquiries in 13 months before the plaintiff's son's death at the hands of prison guards).

Finally, there have been no allegations that Nurse McDade directed subordinates to act unlawfully or knew that subordinates would do so and failed to stop them.  At worst, perhaps she should

have assumed that mistakes might occur if she didn't review nurses' work on the MARs. That is not enough.

### III

We echo the district court's lament that the defendants' "careless actions and their systemic communication failures caused Mr. Henegar serious suffering" and "irreparably altered his life." Doc. 168 at 32. Even so, the bar to proving an Eighth Amendment deliberate-indifference claim is appropriately high, and we conclude that Wade hasn't met it. Because we conclude that Henegar's Eighth Amendment rights weren't violated, the "clearly established" analysis never comes into play. We therefore affirm the district court's order granting all five defendants summary judgment.

**AFFIRMED.**